### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VICTOR R. COTTON,

                      Plaintiff

           v.

THREE RIVERS HEALTH PLANS, INC.,
a Corporation

                    Defendant

Civil Action No. 1:CV-00-1709

Judge Kane

**FILED**

FEB 2 0 2002

PER _____
HARRISBURG, PA  DEPUTY C

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE

## I.    COUNTER-STATEMENT OF PROCEDURAL HISTORY AND FACTS

Defendant filed a Motion in Limine and Brief in Support thereof on January 4, 2002.

Defendant had previously filed a Motion for Summary Judgment on October 12, 2001. By way

of this Court's Order of January 14, 2002 all activity in this case was stayed pending resolution

of Defendant's Motion for Summary Judgment. Subsequently, this Court granted in part and

denied in part Defendant's Motion for Summary Judgment allowing Plaintiff's claim for

wrongful discharge pursuant to Pennsylvania's Medical Gag Clause Prohibition, 40 P.S. section

991.2113(c) and claim for punitive damages to proceed. Plaintiff submits the within Brief in

Opposition to Defendant's Motion in Limine.

## II.    COUNTER-STATEMENT OF ISSUES PRESENTED

**A.    WHETHER DR. COTTON SHOULD BE ALLOWED TO INTRODUCE TESTIMONY AT TRIAL FROM ANY WITNESS LISTED IN PLAINTIFF'S WITNESS LIST?**

        **(Answered in the Affirmative)**

**B.    WHETHER DR. COTTON SHOULD BE ALLOWED TO OFFER EVIDENCE AT TRIAL REGARDING ASSESSMENTS OF HIS JOB PERFORMANCE OR CHARACTER BY NON-MANAGEMENT EMPLOYEES?**

        **(Answered in the Affirmative)**

**C.   WHETHER EVIDENCE AT TRIAL ALLEGING ROMANTIC OR SEXUAL RELATIONSHIPS AMONG ANY THREE RIVERS EMPLOYEES?**

**(Answered in the Negative)**

**III.   LAW AND DISCUSSION**

    **A.   Witness Disclosure**

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.

Rule 37(c) (1) calls for the exclusion of evidence that should have been disclosed pursuant to Rule 26(a) unless (a) the non-disclosing party provides substantial justification for its failure, or (b) the failure to make the required disclosure is harmless.  The non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless.  See Stallworth v. E.Z. Serve Convenience Stores, 199 F.R.D. 366 (M.D. Ala. 2001).

"Substantial justification" for the failure to make a required disclosure has been regarded as "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request."  United States v. Dentsply Intern., Inc., No. Civ. A. 99-5, 2000 WL 654378, *7 (D. Del. May 10, 2000).  "The test of substantial justification is satisfied if "there exists a genuine dispute concerning compliance."  Henrietta D. v. Giuliani, No. 95-CV-0641, 2001 WL 16021114, *5 (E.D. N.Y. Dec. 11, 2001).

"A party's misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced."  Stallworth, 199 F.R.D. at 369.  This connotation of the term "harmless" is derived from the Committee Note to the 1993 amendments to Rule 37©, which offers as examples of "harmless" violations of Rule

26(a), the inadvertent failure to disclose the name of a potential witness known to all parties or the failure to list as a trial witness a person listed by another party. See Burney v. Rheem Mfg. Co., 196 F.R.D. 659, 692 (M.D. Ala. 2000).

The court has discretion in determining whether to bar evidence based upon a party's failure to comply with Rule 26(a). See, e.g., Rambus, Inc. v. Infineon Technologies AG, 145 F. Supp.2d 721 (E.D. Va. 2001). Under Rule 37, "[t]he imposition of sanctions for abuse of discovery…is a matter within the discretion of the trial court." Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995). In Nicholas v. Pennsylvania State University, 227 F.3d 133, 148 (3d Cir. 2000), the court held:

> In considering whether the exclusion of evidence is an appropriate sanction for failure to comply with discovery duties, we must consider four factors: (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

Courts of the Third Circuit should exercise particular restraint in considering motions to exclude evidence. ABB Air Preheater, Inc. v. Regenerative Environmental Equipment Co., 167 F.R.D. 668 (D. N.J. 1996).

In this case, the discovery deadline was August 17, 2001. See Order of Court dated May 31, 2001 (Ex. "J").

The witnesses at issue are the following: 1) Joy Cotton; 2) Anthony Horbal; 3) Mary Mihalyo; 4) James Hancovsky; 5) Diane Laurent; 6) Denise Romeo; 7) Brenda Kehler; 8) Keith Cameron; 9) Tom Clark; 10) Gary Weinstein; 11) Robert Mount Joy; 12) Jack Laeng; 13) Daniel Sacco; 14) Wilford Payne; 15) Matt Liburti; 16) Doug Lehman; 17) Representative of the FBI; 18) Representative of the Pennsylvania Office of Attorney General; 19) Representative of the Pennsylvania Department of Public Welfare; 20) Amy Sandee; and 21) Kelly Lennon. See Attorney Fine's letter of December 28, 2001 (Ex. "H").

3

Many of these witnesses were identified by Plaintiff and even Three Rivers identified many of these witnesses as their own potential witnesses during the course of discovery. Therefore, Defendant's claim of untimely witness disclosure is inapplicable to these witnesses.

A review of the entire file by the undersigned has made it easy for the Court and Defendant's counsel to see where these witnesses were identified. Specifically, Attorney Fine discusses the deposition of Anthony Horbal in his letter of May 29, 2001 (Ex. "C"), Defendant's Responses to Plaintiff's Interrogatories in Answer #6 (Ex. "E"), and Defendant's Supplemental Responses to Plaintiff's Interrogatories in Answer #6 (Ex. "F"). Amy Sandee was identified as a potential witness by Three Rivers in Defendant's Responses to Plaintiff's Interrogatories in Answer #5(b) (Ex. "E") and Defendant's Supplemental Responses to Plaintiff's Interrogatories in Answer #5(b) (Ex. "F").

Specifically, Attorney Lehman identifies potential witnesses in his letter of June 14, 1999 (Ex. "A")  including Anthony Horbal, Denise Romeo, Amy Sandee, James Hancovsky, Mary Mihaylo, Brenda Kehler, Tom Clark, Gary Weinstein, Jack Laeng, Daniel Sacco, Wilford Payne, and Matt Liburti.

Attorney Lehman also identifies potential witnesses in his letter of October 6, 1999 (Ex. "B") including Anthony Horbal, Denise Romeo, Amy Sandee, Kelly Lennon, James Hancovsky, and Mary Mihaylo.

Attorney Haggerty identifies potential witnesses in his letter of August 14, 2001 (Ex. "D") including Amy Sandee and Kelly Lennon.

Kelly Lennon is also identified as a potential witness in Plaintiff's Responses to Defendant's Interrogatories in Answer #6 (Ex. "G").

The remaining witnesses at issue are Joy Cotton, Diane Laurent, Keith Cameron, Robert Mount Joy, Doug Lehman, representative of the FBI, representative of the Pennsylvania Office of Attorney General, and representative of Department of Public Welfare. Defendant was aware

4

of the existence of these potential witnesses.  Any non-disclosure of witnesses was "harmless" since Three Rivers was aware of the existence of the witnesses listed in Plaintiff's Witness List prior to the discovery deadline.  Joy Cotton is the wife of Plaintiff, Victor Cotton.  Diane Laurent, Keith Cameron and Robert Mount Joy are employees of Three Rivers.  Attorney Lehman, the FBI and Attorney General's office were an integral part of Victor Cotton's claim against Three Rivers for wrongdoing.   Voluminous records of the Department of Public Welfare have been produced and the only way to introduce them at the time of trial is to have a records custodian testify.  Therefore, Three Rivers cannot claim that they had no knowledge of their existence.

In conclusion, none of the witnesses at issue listed in Plaintiff's Witness List should be excluded at the time of trial.

**B.    "Character" References**

Fed. R. Evid. 401 provides as follows:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence.

Fed. R. Evid. 402 provides as follows:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority.  Evidence which is not relevant is not admissible.

The witnesses listed by Plaintiff who were co-workers of his at Three Rivers may be called by Victor Cotton to attest to his competency as a manager and co-worker and not his character.

Three Rivers has made the questions of Dr. Cotton's competency as a manager and co-worker key issues in this case.  Three Rivers alleges that Three Rivers terminated Dr. Cotton's

employment because he had "poor management judgment" and "difficulty working with his supervisors."

Dr. Cotton can call former co-workers from Three Rivers as witnesses at the time of trial to refute and/or rebut any testimony about Dr. Cotton's alleged incompetency as a manager and co-worker.

Such testimony would be relevant and admissible according to Fed. R. Evid. 401 and 402.

Moreover, the testimony concerning Dr. Cotton's competency as a manager and co-worker is probative of the fact that Dr. Cotton was doing an excellent job and was well-liked by his subordinates and supervisors.  See Fed. R. Evid. 403.   There is no unfair prejudice, confusion of the issues or misleading of the jury in submission of this evidence to refute and/or rebut any testimony by Three Rivers about Dr. Cotton's alleged imcompetency as a manager and co-worker.  Id.

Accordingly, evidence of Dr. Cotton's competency as a manager and co-worker should not be excluded at the time of trial.

**C.      Evidence of Personal Relationships Among Three Rivers Employees**

The issue of romantic or sexual relationships between **any** Three Rivers' employees are not relevant in this case and should be excluded at trial.  See Fed R. Evid. 401.

## IV.    **CONCLUSION**

For the reasons set forth above, Plaintiff, Victor R. Cotton, respectfully requests that

Defendant's Motion in Limine be denied.

Respectfully submitted,

HAGGERTY LAW FIRM

By:_____

William E. Haggerty, Esquire
Counsel for Plaintiff
Attorney I.D. No. 23845
240 North Duke Street
Lancaster, PA  17602
(717) 397-3200

## CERTIFICATE OF SERVICE

    I hereby certify that I am this day serving a true and correct copy of the foregoing

document upon the person(s) and in the manner indicated below, which service satisfies

the requirements of the Federal Rules of Civil Procedure.

## SERVICE BY FIRST CLASS MAIL ADDRESSED AS FOLLOWS:

David R. Fine, Esquire
Kirkpatrick & Lockhart
240 North Third Street
Harrisburg, PA  17101-1507

 

                                   HAGGERTY LAW FIRM

DATED:   February 19, 2002        By:_____

                                   William E. Haggerty, Esquire
                                   Attorney I.D. No. 23845
                                   Attorney for Plaintiff
                                   P.O. Box 1527
                                   Lancaster, PA 17608-1527
                                   (717) 397-3200

*Computer printout*

# Lehman & Lehman
### Attorneys At Law

Douglas P. Lehman
Emmett R. Lehman, II

230 N. Duke Street
Lancaster, PA 17602
P-(717) 392-3711
F-(717) 392-3838

June 14, 1999

Mr. Dave Thomas, Esquire
Director of Corporate Compliance
Three Rivers Health Plans
300 Oxford Dr.
Monroeville, PA 15146

Fax: 412.380.6013
Hard Copy to Follow

Re: Cotton vs. Three Rivers Health Plans

Dear Mr. Thomas,

We are in receipt of your letter dated 4 June 1999. Your settlement offer is rejected.

Since the receipt of your offer, we have spent many hours with Dr. Cotton. These sessions produced a clear track record and paper trail of evidence and indicate clearly that liability in this case lies with TRHP in many issues. With Dr. Cotton, we documented each and every relevant conversation, incident, meeting, sequence of events, the witnesses to each item, and each and every relevant memo, document, letter, contract, piece of physical evidence, where each piece of evidence is located, and who has the custody of each.

I strongly suggest that you review the facts of this case with an eye to the truth, not to create a defense. The truth will be established. I further believe that TRHP's verbal acknowledgment of the truth, a TRHP apology to Dr. Cotton, and TRHP working within the truth will go a long way towards erasing the damage of your offer and forging a resolution acceptable to Dr. Cotton. I am sure you are aware of Dr. Cotton's abilities, and his unparalleled "fanatical" support within TRHP, and indeed his admiration throughout the industry. The facts being so one-sided and the truth so widely known and understood throughout TRHP make your offer particularly demeaning to Dr. Cotton. Above all else, Dr. Cotton is a person of integrity; the truth will be quickly forthcoming and will prevail.



**EXHIBIT**

"A"

Mr. Dave Thomas, Esquire
Three Rivers Health Plans
14 June 1999
Page 2

Dr. Cotton is a worker, and a team worker. He enjoyed the adoration of nearly every person in TRHP, and his ability as a physician, lawyer, and businessman drew people to him in droves. In addition to his own 6 departments, he established working relationships with departments that most HMO medical directors never speak with, let alone play major supportive roles. Dr. Cotton provided support to the Claims Department in the form of leading a weekly meeting to discuss payment policy. He assisted the Finance Department in the resolution of payment issues, review of medical records for coding questions and in the interpretation of contract terms. He provided the majority of the support to the Provider Relations and Network Development Departments. He assisted the Marketing Department in recruiting physicians to use their offices as marketing sites. He enjoyed a strong relationship with Member Services staff and regularly assisted them with problems. Dr. Cotton assisted the Health Data Department in the design and interpretation of medical databases. Indeed, there was not a department in the company that did not enjoy a strong, supportive relationship with Dr. Cotton. Dr. Cotton promoted empowerment and growth and went so far as to prepare a one hour educational session every week that was attended by at least 50 persons, representing every department in the company. The success of this team building exercise was openly recognized and promoted on multiple occasions by both Mr. Carmicheal and Mr. Lawson. Evidenced by the line at his door that averaged 3-4 deep, and the dozens of cards, letters, and calls that he has received since his departure, Dr. Cotton clearly has abilities contrary to the far reaching and vague assertions stated in your offer of 2 June 1999.

Although repeatedly and wrongfully criticized by another executive (one only) for the "lack of management skills," Mr. Carmicheal regularly referred to Dr. Cotton's supporters as "fanatical." In addition to his own 6 departments, Dr. Cotton had 4 other department leaders request that perhaps some way in the future they could be reassigned so as to report to Dr. Cotton. These departments included Provider Servicing, Network Development, Ancillary Contracting and Health Data Analysis.

In fact, the so called "management failures" that were wrongfully and repeatedly cited by another TRHP executive (one only) as Dr. Cotton's "failures" consist of a QI Director who had a problem listening to anyone, a Pharmacy Director who (perhaps) had a substance use problem that endangered patient care, and two woman who (perhaps) let their emotions go too far. Unfortunately, when Dr. Cotton did ask other TRHP executives for help in these matters, he was met with document suppression, betrayal and condemnation, lies, failure to respond as agreed upon by executive co-decision, and finally retaliation and wrongful termination without cause.

Mr. Dave Thomas, Esquire
Three Rivers Health Plans
14 June 1999
Page 3

     Dr. Cotton asked that Mandella be told to stop making defamatory remarks and behaving in an egregious manner, but was wrongfully and repeatedly criticized by another executive for improper behavior toward Mandella.  Dr. Cotton asked that patient care be protected from a impaired Guffy, but was wrongfully reprimanded by another executive for not giving Guffy a chance.  Dr. Cotton asked that Wetzel not be allowed to drive good people from TRHP, but was wrongfully blamed by another executive for Wetzel's departure.  Dr. Cotton asked that Casey not be permitted to strike, assault and defame him, but was wrongfully met with, by another executive, document suppression, lies, withholding exonerating information and documentation, and ultimately retaliated against with wrongful termination, without cause.   When Dr. Cotton asked for clarifications on these matters, he was called a failure by another executive, and when asked what role the truth played in Mr. Carmicheal's decision making relative to these matters, Dr. Cotton's psychological well-being was brought into question.  Ultimately, faced with a badly deteriorated support and power base within and indeed throughout TRHP, a total loss of integrity throughout TRHP personnel, and a person with abilities superior to his own, Mr. Carmicheal used the only thing remaining to him, his superior position within TRHP, to retaliate against Dr. Cotton and ask him to resign, wrongfully and without cause.

     The above, and Dr. Cotton's contract and damages will be established.  Your assertions generally questioning Dr. Cotton's abilities will necessitate our deposing persons such as (1) Scott Markovich, Manager of Network Development (2) Donna Lengle, Manager of Utilization Management Department (3) Amy Sandy, Supervisor of Utilization, departed (4) Debbie Cerutti, Utilization Management Nurse, departed (5) Lori Shields, Utilization Management Nurse (6) Nancy Klimon, Director of Special Needs Department (7) Louis Perry, Director of Claims (8) N. Mark Richards, MD, Medical Director (9) Dennis Romeo, Manager Provider Relations (10) Anna Paglia, Provider Data Department (11) Michael Fanton, Network Developement Department (12) Lynn Campbell, Network Developement Department (13) Dan Okanak, Network Developement Department (14) Nancy Heider, Supervisor, Claims Department (15) Pat Casey, Ex-UM Department (16) Andrea Pritts, RN (17) Brenda Kehler, RN (18) Deanne Brakstor, Director of System Conversion (19) Jim Hancovsky, Pharmacy Director (20) Peggy Wetzel, Ex-Director of Quality Improvement (21) Jennifer Adams (22) Warren Carmicheal, CEO and Chairman of the Board (23) William Lawson, Esq., Majority Shareholder Representative (24) Beverly Ludlum, Manager of Human Resources (25) Mr. Donovan, Esq. (26) Jill Guffy, Ex-Director of Pharmacy (27) Dr. Happ, Ex-Medical Director (28) Beth Shogan, Ex-Director of Utilization Management (29) Mary Mihalyo, Ex-Director of Pharmacy (30) Anthony Horbal (31) Dave Heitman, VP of Operations (32) Dr. Sheridan, Medical Director (33) Danette Mandella (34) Karen Heim-McKean, Finance Department (35) Jerry Hogenmiller (36) Keith Vollberg, Manager of Ancillary

Mr. Dave Thomas, Esquire
Three Rivers Health Plans
14 June 1999
Page 4

Contractor (37) Claudia Roddy, Manager Provider Servicing (38) Denise Romeo, Manager Provider Services (39) Jane Charlton, Esq. Naturally, these witness would also be asked to testify to the actions, words, and abilities of other TRHP executives.

Your assertion questioning Dr. Cotton's behavior and performance in business and contractual settings will necessitate our deposing (1) Janet Bitanti, Executive Director, Centerville Clinics (2) Debbie Kaplan, Senior VP, Allegheny General Hospital (3) Jack Laeng, Executive Director, Primary Health Network (4) Steve Handy, CFO, Uniontown (5) Tom Clark and Gary Weinstein, CFO at Washington (6) Dave Glancy, Pres., Rx Home Care (7) Daniel Sacco, VP of Managed Care, Western Pennsylvania Hospital (8) Fred Balzer, Latrobe Hospital (9) Brenda Heinzelman, Account Mananger, PCS (10) Rose Broderick, ED, Heritage Alliance (11) Robin Mohr, St. Francis Hospital (12) Wilford Payne, Executive Director, Alma-Illery Clinic (13) Daniel McMarthy, Executive Director, Renaissance Family Practice (14) Gino Benedetti, VP of Contracting, HealthSouth Hospital (15) Barry Baker, Wyoming Valley Hospital (16) Susan Flynn, Executive Director, Vale-U-Health (17) Matt Liburti, VP of Managed Care, Sharon Regional Hospitals.

In your effort to create a defense for TRHP, your offer contained many false allegations against Dr. Cotton that resulted only in severely diminishing the possibility of resolving this matter without litigation. The assertions contained in your letter for at-cause termination reasons are, at best, untrue, and at worst, in bad faith. The fallaciousness of your assertions can be proven with testimony from Dr. Cotton's "fanatical," loyal following within TRHP, supporting documents and memos relative to given situations, and a review of the profits and performance of TRHP that can be directly traced to Dr. Cotton's success and efforts as a physician, lawyer, and businessman.

Be assured, Mr. Thomas, that Dr. Cotton would like to work this out without litigation. Dr. Cotton is completely confident that litigation can only hurt TRHP, and Dr. Cotton has no desire to hurt TRHP, per se. I cannot stress strongly enough, however, the extent to which Dr. Cotton will pursue an equitable resolution to this matter. To this end, Dr. Cotton has diligently documented all relevant information and evidence concerning this case, which are now at our disposal. To refute your assertions would be simple, as your honest analysis of the facts would reveal. To this end, and to preserve evidence, I can assure you that our discovery process will be immediate and thorough, including but not limited to, written interrogatories, production of documents and depositions for all TRHP employees of all departments with any contact with Dr. Cotton.

Mr. Dave Thomas, Esquire
Three Rivers Health Plans
14 June 1999
Page 5

To ease your apparent concern, Dr. Cotton has not disparaged the company in any way, and has no intention to do so. Dr. Cotton never told anyone they would be next to be fired, nor made any insinuations to that effect.

Without prejudice, you offer failed to address issues contained in our letter of 2 June 1999, a copy of which is attached for your review. Please break any offers into categories to address the following:

1. Severance Compensation. Industry standard for severance compensation is six to 12 month salary. Dr. Cotton will demand 12 months compensation.

2. Stock Options. These stock options were a part of Dr. Cotton's restructured compensation package. TRHP and Dr. Cotton initially agreed to a base of $150,000 with a potential for performance based incentives of at least $50,000. The performance bonus was tied to medical costs, which Dr. Cotton greatly improved. In late 1998, regulation change banned such incentives, and, in a desire to forge a lasting relationship, the present stock option agreement, and 1-3% after-tax profits (budget at $6 million) compensation agreement (in the event the relationship ended prior to sale of the company) was reached. These values have accrued. Dr. Cotton can prove inducement and reliance. This issue must be addressed.

3. House Purchase Damages. Dr. Cotton will demand to be compensated for his losses relative thereto.

4. Professional Reputation. Dr. Cotton will demand compensation commensurate to these damages.

We will consider a _reasonable_ offer in settlement. Your present offer _might_ cover #3, above. Should you have any questions, please do not hesitate to contact me.

Sincerely,

Douglas P. Lehman, Esq.
Lehman & Lehman, Attorneys

cc: Dr. Victor Cotton

*Computer Printout*

# Lehman & Lehman

### Attorneys At Law

Douglas P. Lehman
Emmett R. Lehman, II

230 N. Duke Street
Lancaster, PA 17602
P–(717) 392–3711
F–(717) 392–3838

October 6, 1999

Kirkpatrick and Lockhart, LLP
Mr. Hayes C. Stover, Esquire
1500 Oliver Building
Pittsburgh, Pennsylvania, 15222-2312

Re:  Cotton vs. Three Rivers Health Plans, Inc.

Dear Mr. Stover:

     We are in receipt of your letter dated 26 August 1999.  Your offer in settlement is rejected.

     We are in receipt of the following exhibits:  Dr. Cotton's investigation interview dated 22 July 1998, and Mandella's investigation interview dated 15 July 1998.  Dr. Cotton's investigation report is missing pages two through five, 10, 12-14 and 16.  Dr. Cotton finds this deletion to be in bad faith.  Please forward the entire document.  The documents you forward only convince Dr. Cotton of the strength of his position.  My client is well aware of the multiple other documents related to the Mandella, Casey and other issues you have raised, and where they are located, and whom has custody of each.  My client is also well aware of the investigation of the Mandella and Casey incidents, who was interviewed, what reports were generated, and the conclusions of each. That TRHP would now attempt to rely on incidents and documents that it knows to be disproved approaches bad faith.

     Certainly you know that it is never advisable, from a legal or procedural standpoint, for a party to reveal to its opposition how it intends to prove its legal or factual position, prior to the filing of the lawsuit.  Be assured, exactly how Dr. Cotton intends prove his legal position, and the precise facts necessary to do so, will be clear should we need to go to litigation.  In previous communications, I specifically refrained from divulging the specific facts of our case, and refrained from naming TRHP executives by name when making assertions, only referring to them as administration or executives, hoping to rely upon your skill as counsel to extract the complete and straight facts from your client.  Unfortunately, you have mistaken this respect for TRHP personnel as "broadly stated and undocumented assertions and innuendo against TRHP" personnel.  In any case, with discovery and trial there will be no secrets, and perhaps divulging the facts to you now will help to end this matter.

     My client is reluctant to litigate this matter.  Dr. Cotton wishes no ill-will against TRHP, and is certain that litigation will only serve to hurt TRHP and persons within TRHP, many of whom Dr. Cotton truly cares for.  Because the current TRHP assertions against Dr. Cotton are so unbelievable, and because Dr. Cotton is reluctant to litigate this matter, Dr. Cotton feels it

**EXHIBIT**
" *B* "

1

necessary refute each of your assertions, disclose to you the detailed facts about the instances which you have chosen to highlight and list the witnesses that will testify to each matter. Rather than simply commencing hostilities with a simple complaint and beginning the discovery process, Dr. Cotton feels that to refute your assertions will be more productive and has directed me to expend whatever time necessary in preparing this response to your letter dated 26 August 1999. Your letter also expressed regret that I had not provided facts sufficient to support our case, and invited us to so. Our response will also dispel your notion of "broadly stated and undocumented character assertions and innuendo against TRHP" by Dr. Cotton. It should also impress upon you that the facts are clearly on the side of Dr. Cotton, that Dr. Cotton is in great command of the facts, that Dr. Cotton knows precisely how to extract the necessary supporting testimony and documentation of these facts, and that Dr. Cotton knows precisely where the evidence is located once the discovery process begins. As your letter states, counsel, you are precisely correct that, as attorneys, we are only as knowledgable of the facts as our clients allows us to be. The following information should provide you with the detail necessary for you discuss this matter fully with your client. I strongly urge you to do so. The individuals named in the recitation of the facts below are named because they have first hand knowledge of the fact asserted. I will address your assertions or highlighted instances as they appear in your letter. I apologize in advance for what certainly will be a lengthy correspondence.

### "Dr. Cotton/TRHP contract"

Dr. Cotton had an employment contract with TRHP. I am sure your client has informed you of the specifics of Dr. Cotton's contract. Let us review for the record. When Dr. Cotton came to TRHP, the parties agreed to a target salary of $200,000 per year. His base salary was $150,000 and he had an incentive based on medical costs that was designed to yield $50,000 per year with good performance. The terms of this agreement are a part of Dr. Cotton's employment file, which I am sure you have access to. Please forward a complete copy of Dr. Cotton's employment file. Through his superior performance, Dr. Cotton eventually earned over $20,000 a quarter in incentives alone. In addition, Dr. Cotton participated in the TRHP quarterly bonus plan for all employees and had received over $30,000 in distributions over the year prior to his termination.

After TRHP was reorganized in the summer of 1998, and because of Dr. Cotton's stellar performance, Bill Lawson and Dr. Cotton discussed their mutual desire to make Dr. Cotton a more permanent part of the company. Mr. Lawson stated to Dr. Cotton that he would like to structure a deal by which Dr. Cotton would be treated like a partner and have a long term interest in the company. The parties also needed to compensate Dr. Cotton for the impending loss of his incentive agreement, which new regulations would make illegal December 31, 1998. In structuring the new agreement, Dr. Cotton and Mr. Lawson agreed that the deal would be structured so that Dr. Cotton would forgo present income in return for future income. The deal was structured in a way that reduced Dr. Cotton's then present compensation in return for the promise of a potentially greater reward in the future. Initially, the deal contained only the stock option portion. This was too open ended for Dr. Cotton's liking as it was uncertain when the company might be sold. Accordingly, Dr. Cotton informed Lawson that there needed to be some shorter term mechanism so that Dr. Cotton would be guaranteed that something would be there in the event that the company was not sold. As your 28 July 1999 letter eludes to, TRHP asked Dr. Cotton for a five year commitment, but the parties agreed to three years. Lawson added the right to a percentage of the profits language (section 24) so as to meet this timeline. If Dr. Cotton left the company after three years, he would be entitled to 3% of the company profits to that point. The agreed upon terms gave Dr. Cotton the "option and percentage of profits' agreement" and, in

2

exchange, Dr. Cotton agreed to eliminate his incentive agreement effective September 30, 1998 (at a cost of approximately $20,000 to him for the fourth quarter alone), and to cap his portion of the employee bonuses at $25,000 per year. He also agreed to keep his base pay at $150,000 per year, even though his promotion from Associate to Senior Medical Director, performance, and tenure with the company clearly entitled him to more. This bargained for exchange was reduced to a memo from Lawson to Cotton on December 1, 1999, which I am sure is in the file. The formal stock agreement followed later.

In fashioning this new long term compensation agreement, Lawson openly stated that a written employment contract was not enforceable by the company, and that he preferred to seal the deal with money. Accordingly, he structured a deal for Dr. Cotton that gave Cotton ever-increasing incentive to stay with TRHP, in that the percentage rose with each passing year. Lawson gave Dr. Cotton assurances that TRHP was interested in a long term relationship with Dr. Cotton, and that TRHP would make every effort to ensure that the relationship was prosperous for both parties. Lawson and Dr. Cotton agreed to a long term commitment of three years, and the deal was structured accordingly. A memo from Lawson to Dr. Cotton dated 14 September 1999 (also in Dr. Cotton's employment file) shows that the agreement was weighted toward equity and describes that in return Dr. Cotton would agree to keep his present salary, cap his bonus, and eliminate his incentive plan. The facts of the matter clearly show that the agreement was clearly one where Dr. Cotton gave up present, accrued income for reward in the future and both parties agreed that the structure was one that bound them together. As Mr. Lawson said to Dr. Cotton at the time: "We are bound together by money, and that is better than any written agreement." After several adjustments to the language, the final documents were forwarded to Dr. Cotton in May 1999. In reliance upon these documents and the repeated representations, assurances, and promises made by TRHP executives, Dr. Cotton purchased the home in the area.

In summary, in recognition of Dr. Cotton's stellar performance, TRHP restructured his compensation in a manner that reduced current and accrued compensation in return for future compensation. Dr. Cotton's present pay was not reduced as a form of punishment, but rather as a bargained for exchange. Detrimentally relying on these terms, representations, and assurances, Dr. Cotton performed for eight months at sub par rates and forgoing thousands of dollars in present income to be paid later. Dr. Cotton detrimentally relied on representations and assurances by purchasing a home in the area. Such an agreement, reliance and consideration is the contract that binds TRHP. TRHP can only sever such an agreement for "just cause." TRHP had no just cause for terminating Dr. Cotton's contract. For a good discussion on these points, see <u>Green v. Oliver Realty</u>, 526 A.2d 1192 (Pa Super 1987). Surviving a motion to dismiss will not be a problem.

<u>"Poor management performance,"/ "inability or unwillingness to interact appropriately"</u>

As best as can be determined from your correspondence, it appears that TRHP is attempting to create a defense of "just cause" or "for cause" termination of Dr. Cotton centered around "poor management." Although I appreciate your need to be an advocate for your client, this defense will not withstand scrutiny of the facts, particularly at discovery and trial. Based upon the facts, all related documents and testimony, and TRHP's financial performance before, during and after Dr. Cotton's tenure, we are comfortable that there can be no "for cause" termination. Dr. Cotton has provided me with great detail about his successes, and I can assure you that Dr. Cotton will have little difficulty disproving such a theory as TRHP seems to be attempting to create. For TRHP to advance such a defense is truly amazing, causing me again to strongly urge you to investigate this case further than TRHP executives.

3

TRHP has chosen to highlight Mandella and Casey and as examples of this assertion. Dr. Cotton will review the facts of these matters, will include Wetzel and Guffey for your further analysis, and will address the Lengle matter. Dr. Cotton will revert, for this portion only, to a chronological recitation of facts and events.

Dr. Cotton came to TRHP in September, 1997, as Associate Medical Director. He was recruited by Mr. Horbal, who told Dr. Cotton he was to control medical costs and make money. Dr. Cotton had no departments or persons reporting to him at the time. Dr. Cotton set about learning the company and gradually redirected the medical staff's efforts. The results were immediate and immense. Medical costs dropped and profits soared. Medical staff turnover fell significantly. Within four months, Dr. Cotton was promoted to Senior Medical Director and placed in charge of all medical departments. In February, 1998, Dr. Cotton accompanied shareholders to a meeting that focused on the possible sale of the company, and was offered $50,000 if he helped them through a sale.

Due to his knowledge and his interpersonal skills, people were drawn to Dr. Cotton. With this, his responsibilities continued to accumulate. In addition to all of the medical departments, and contrary to your vague assertion about the Washington provider, Dr. Cotton eventually played the primary supportive role to the provider relations managers, Scott Markovich, Claudia Roddy, Denise Romeo, and Keith Vollberg. Although these persons did not report to Dr. Cotton, he had daily interactions with them and regularly accompanied them on meetings out of the office. In fact, none of them would deal with some problematic providers unless Dr. Cotton was present. Dr. Cotton was repeatedly asked to step in when the issues with providers became difficult, and was asked back because of his performance. Markovich regularly came to Dr. Cotton with words such as "[The provider] said that they would not meet without you there. Can you make it?" or "I don't want to go there without you." In addition, Dr. Cotton was told by three of these provider relations managers that they would like to report directly to Dr. Cotton (rather that Carmichael). Carmichael contemplated this on several occasions, but decided Dr. Cotton had enough to do already.

– MANDELLA

For TRHP to offer the Mandella incident as a reason for Dr. Cotton's termination again approaches bad faith, and potentially creates a new cause of action for Dr. Cotton. This matter was thoroughly investigated and positively concluded no wrongdoing by Dr. Cotton. TRHP's position is incorrect and the manner in which it is presented is clearly inappropriate. It is with consternation that I note that select pages from Dr. Cotton's statement have been eliminated and not forwarded. TRHP has failed to include multiple other statements that were taken in conjunction with this investigation, and have failed to include the conclusion of the investigator. Because your client may not have provided these statements or conclusions to you, or even informed you of their existence, let us review the facts of the matter.

Every person interviewed on the matter said the same thing: that Mandella was at fault and had acted in an egregious manner towards Dr. Cotton, and that Dr. Cotton had not sexually harassed her. In fact, Mr. Hogenmiller called Dr. Cotton several weeks after the matter had been closed and stated to the effect that "I have been involved in over 200 of these types of matters, and can honestly say that I have never seen anyone come through it as cleanly as you have. It seems ironic, but based upon all of the highly complementary things that were said about you, I believe that you have emerged from this investigation with a better reputation than when you went into it.

4

I think the manner in which you conducted yourself before and during the investigation says a lot about your character." I am sure Attorney Hogenmiller will share these thoughts with you. I am also certain that Hogenmiller can share with you other widely known sexual activity between TRHP executives (excluding Cotton) and subordinates. If we are correct in assuming that TRHP is extending the Mandella matter as reason for terminating Dr. Cotton, forward this assertion in a positive statement with TRHP executive signatures. Immediately forward the investigatory statements on the matter from Pat Casey, Amy Sandy, Michelle Jones, Kelly Lennon, Terry Quinn, and investigator Hogenmillers' concluding report.

Dr. Cotton's behavior did not subject TRHP to liability in the Mandella case. To the contrary, after a thorough investigation, Dr. Cotton was exonerated of any wrongdoing. Mandella was terminated because no one could work with her, and because her behavior was so offensive, there was no where to place her in the company. Near the conclusion of the investigation, the nursing staff issued an ultimatum that Mandella be terminated, stating they would not work with her. In discussions surrounding Mandella's termination, Mr. Lawson stated that there were two things under which Mandella may sue TRHP. The first was sexual harassment, which Lawson stated Mandella would definitely lose. The second was TRHP retaliation against her for filing the complaint. The second possibility was cause of concern. As part of the termination process of Mandella, each of the nurses were asked if anyone (i.e. Cotton) had put them up to the act (issuing the ultimatum). To a person the nurses denied this was the case. I am certain that all of this information will be in Mandella's employment file. Please forward a complete copy of Mandella's employment file. Dr. Cotton's actions have not exposed TRHP to liability.

Dr. Cotton sent the July 9, 1998, memo in an effort to ensure that the Mandella investigation was indeed fair, and the forum was fair. As the following will show, Dr. Cotton's concerns about the fairness of the investigation were well founded. Interestingly, Carmichael is again the center of the problem. Carmichael's handling of the Mandella matter was inexplicably and inexcusably unfair, in bad faith, retaliatory, intentional, and damaging to Dr. Cotton. Because Mandella's behavior was outrageous and out of control, as confirmed by the other nurses in the investigation, and because Mandella had made physical threats to Dr. Cotton, Dr. Cotton had no recourse but to ask for help in the matter. He prepared a complaint letter and attached 3 signed statements from members of the nursing staff detailing Mandella's behavior and Mandella's threats against Dr. Cotton. Because Dr. Cotton knew that Carmichael would try to turn this situation against him, Dr. Cotton placed these documents in a packet along with a copy of the above memo to Ludlum. So there would be no question as to his filing of these documents, Dr. Cotton went over each of them with his secretary, Kelly Lennon, and Pat Casey. He had each of them commit to memory which documents were in the packet. So there would be no question as to delivery, Dr. Cotton then had Casey deliver the packet to Carmichael and review the contents with him.

Although Carmichael immediately retained Attorney Hogenmiller as an investigator, Mr. Carmichael did not forward Dr. Cotton's documentation to Mr. Hogenmiller. As a result, rather than addressing the threats of physical harm against Dr. Cotton, the investigation began in the direction Carmichael wanted - what Mandella had to say about Dr. Cotton. After two weeks of waiting for a response, Dr. Cotton asked Carmichael why the company was letting him stand in harms way while Mandella continued to disparage him (Cotton). Carmichael and Dr. Cotton together placed a call to Hogenmiller. Hogenmiller assured Dr. Cotton that there was no basis to the "rumors" of physical harm to him and that the first order of business was to address the party bringing the complaint, namely, Mandella. Dr. Cotton asked Hogenmiller why the investigation was taking the route it was and why he (Hogenmiller) was dismissing signed statements as

"rumor." Hogenmiller stated he wasn't sure what documents Dr. Cotton was talking about, at which point Carmichael hastily terminated the conversation.

Realizing that his signed documents were not being given the proper attention, Dr. Cotton sent the 22 July 1998 letter which asks for clarification on the rules of the proceedings. The next day, Hogenmiller and Dr. Cotton met and Hogenmiller confirmed Dr. Cotton's suspicions that Carmichael had withheld the evidence and had not delivered the documents in a timely manner. Because Hogenmiller's answers assured Dr. Cotton of Hogenmiller's integrity, the issue was put to rest. Afterwards, Hogenmiller stated that he was glad that Dr. Cotton had raised the questions, and complemented Dr. Cotton on the quality of the document produced in only a few hours. Although Dr. Cotton purposefully did not retain counsel for this matter so as to not appear adversarial toward TRHP, he nonetheless had the right to ask questions to ensure that the process was fair. In this case, despite the process not being fair, Dr. Cotton drafted and sent a well written, non-confrontational letter that Hogenmiller said he understood completely. Given Hogenmiller's repeated compliments of Dr. Cotton's behavior, your characterization of this letter as an attack is untenable. Additionally, the present characterization of this letter as an attack, when Hogenmiller, the person to whom the letter was directed, did not consider it an attack is absurd.

## -- GUFFEY

After Carmichael's attacks drove Mihalyo from the pharmacy director position, a replacement was sought. Carmichael decided upon Guffey. Dr. Cotton twice expressed to Carmichael his concern about Guffey's ability and commitment. Carmichael ignored Dr. Cotton and hired her anyway.

Within weeks of starting, Guffey developed a mysterious medical condition that required her to take large amounts of pain killing medication. Her story did not withstand logic or medical analysis, and the nursing staff openly commented that Guffey was "on something." Guffey missed large amounts of work, refused to provide medical justification when asked to do so by Ludlum, and continued to take drugs. Dr. Cotton documented all of this with TRHP, which should be contained in Guffey's employment file. Please forward a complete copy of Guffey's employment file.

When Guffey became so impaired that she could not even remember a conversation that Dr. Cotton had with her a day earlier, Cotton informed Carmichael that Guffey must be removed from medical decision making until her situation could be properly evaluated. In his role as senior medical director, Dr. Cotton's foremost duty was to ensure that medical decisions were made in a competent manner. Indeed, TRHP owed every member this duty and it could never be compromised. Having worked in healthcare for 15 years, Dr. Cotton knew that persons in Guffey's condition must be relieved of duty until the situation could be evaluated. Dr. Cotton had never seen it done otherwise.

Carmichael saw the matter differently. Remember, counsel, that Carmichael had hired Guffey over Dr. Cotton's concerns and objections. Carmichael stated that TRHP could not afford to pay Guffey to sit at home and that Dr. Cotton was blowing the issue of protecting patient care out of proportion. Dr. Cotton, seeing that Carmichael was unable or unwilling to see the proper magnitude of the situation (or perhaps simply unwilling to admit that he had hired the wrong person over Dr. Cotton's objections, and that Dr. Cotton's concerns about Guffey were being found to be correct), insisted that something be done. Carmichael referred to Dr. Cotton as being

6

"volatile" and, in spite of the facts, characterized the matter as a personal difference between Dr. Cotton and Guffey. Carmichael directed that Dr. Cotton "give Guffey a chance." One must ask: To "give Guffey a chance" at what? Killing a member patient?

Due to Carmichael's directive, which was contrary to the facts, was in defiance of all reason, and was at the expense of patient well-being, Dr. Cotton was now unable to resolve the Guffey situation and protect TRHP members. Dr. Cotton attempted to restrict Guffey's activities so as to contain the damage, protect patient care, and protect TRHP from liability, but was directed by Carmichael to allow Guffey to continue to make medical decisions. She did so until her resignation some two months later. For Dr. Cotton's efforts to restrict TRHP exposure resulting from Guffey's condition and Carmichael's directive, he was criticized by Carmichael. When you review Guffey's file, you will see that Guffey continued to function without restriction for two months after Dr. Cotton first documented serious concerns about patient care at TRHP.

Carmichael's unwillingness to handle this matter properly (regardless of his motive) intentionally endangered the health of 70,000 members and stands as the single greatest violation of proper patient care that my client has ever witnessed. Dr. Cotton was so troubled by this breach of duty that he openly contemplated resignation, and months later, after Thomas had arrived at TRHP, sent a memo to Thomas discussing the situation and stating that TRHP needed to implement a formal policy to deal with impaired healthcare professionals, lest TRHP make the same mistake again, again exposing TRHP to liability.

With Guffey's departure, and after considerable persuasion of Carmichael, Dr. Cotton was permitted to choose the next pharmacy director. Dr. Cotton chose Hancovsky, a genuine superstar who has mixed medicine, business and personality in a manner that rivals Dr. Cotton's talents. The pharmacy department moved forward at a dramatic rate. Naturally this was all very intimidating to Carmichael, with Dr. Cotton's choice of pharmacy director being such a success after Carmichael's choice of pharmacy director had been such a colossal failure. Carmichael now complained that Dr. Cotton was "picking up too much momentum." Momentum to what? Success within TRHP? Success for TRHP? Carmichael's job? Dr. Cotton was again only doing his job the only way he knew how; to the best of his ability. Which was, once again, easily and notably, far ahead of Carmichael's ability or performance, and Carmichael had difficulty dealing with this fact. Sometime thereafter, Carmichael began criticizing Dr. Cotton for "not giving Guffey a chance," as previously noted.

-- <u>WETZEL</u>

Nor can Dr. Cotton be accused of being too hard on Wetzel, or not "giving her a chance." Let us again examine the facts. Wetzel was the QI Director. She was hired without any input from the medical staff. She clashed with nearly every person in the company that she came in contact with. Dr. Cotton was repeatedly left to deal with the personal shortcomings that followed her wherever she went.

After several months, Dr. Cotton, Carmichael, Richards, and Wetzel began a series of meetings in an attempt to better define Wetzel's problems and set reasonable goals. In addition, Wetzel was reassigned so as to report directly to Richards - who's interests were more closely aligned with Wetzel's. Matters deteriorated, and Carmichael noted that Wetzel could not be communicated with and simply would not listen. Eventually, through Richard's documentation of her inadequate performance, Wetzel was terminated.

The resulting jubilation within TRHP could not be contained. Even Carmichael commented about the release of enthusiasm and creative energy that occurred among the staff when Wetzel left. Richards assumed control of the QI Department, and all seemed well.

Unfortunately, some time later, again for reasons beyond the understanding of anyone within TRHP who was aware of the facts, Carmichael began criticizing Dr. Cotton for "not giving Wetzel a chance." No amount of reasoning could change Carmichael's mind, and Dr. Cotton eventually just accepted this sort of treatment from Carmichael as part of Carmichael's inferiority complex and general character.

-- CASEY

Let us again review the facts concerning the Casey matter. As the medical departments grew in size, and as Dr. Cotton played larger and larger roles with other departments, Dr. Cotton had less time to spend with any given person, including Casey. This forced Dr. Cotton to expend less time and attention to Casey's work needs, and apparently, her growing emotional needs. That Casey was emotionally attached to Dr. Cotton is evidenced by the multiple persons already on record with the compliance officer, and is incontrovertible. Casey began complaining about the lack of Dr. Cotton's attention, jokingly, at first. As her emotional attachment strengthened, she became more aggressive, openly complaining and, in an attempt to control access to Dr. Cotton, attacking any persons who came near him.

When Dr. Cotton became aware of Casey's behavior, Dr. Cotton met with Casey and assured her of his support. This did not satisfy Casey, as she was unable to contain her emotions. In one outburst she cursed Dr. Cotton and physically struck him over a minor issue. The next day she apologized to Dr. Cotton. Dr. Cotton, displaying an incredible effort to work things out with her professionally, told her to forget it, and never do it again.

Unfortunately, Casey could no longer contain or control her emotions. Despite a series of team building meetings among Dr. Cotton, Casey, Lengle and Sandy, Casey could not function in her role. She openly wept, telling others that her relationship (that never was) with Dr. Cotton was over. In a meeting, she told her staff that she had hit Dr. Cotton, and that "He deserved it." When Dr. Cotton learned of this, he met with Casey and asked her to refrain from such statements, that there never was and never will be anything between them.

Eventually, Casey's sorrow from rejection turned to spite. Unbeknownst to Dr. Cotton, Casey began meeting with Carmichael, complaining about Dr. Cotton and accusing him of disloyalty. Rather than attempt to remedy the situation or attempt to help his executive (Cotton), Carmichael decided to try to turn yet another situation against Dr. Cotton. He told Casey of his plans to get rid of Dr. Cotton, and told Casey that her documentation would help Carmichael do so. Casey reported this to her staff, who informed Dr. Cotton. Backed by Carmichael, Casey now openly ignored Dr. Cotton and continued to speak her mind. The staff was appalled at her conduct. Casey also began mistreating and defaming multiple others in the company as well. Her remarks were highly personal and offensive. Even Carmichael became offended when he heard some of the remarks.

Unable to solve the problem, Dr. Cotton finally asked for assistance in early April. The evidence supporting Dr. Cotton's position was and is incontrovertible. Carmichael, in an attempt to blame the matter on Dr. Cotton, attributed the events to management failures by Dr. Cotton. Carmichael's story did not and does not withstand scrutiny. Then and now, Dr. Cotton is being

8

blamed for being too hard on Casey and, at the same time, for not reporting her crime against him. As your most recent letter indicates, Dr. Cotton is blamed for not bringing the matter to TRHP's attention sooner, and for some ill-defined liability that has resulted therefrom, yet the evidence shows that Carmichael already knew about the matter long before Dr. Cotton asked for help. Prior to April, Casey had been meeting with Carmichael and telling him of her perceived problems with Dr. Cotton and accusing Dr. Cotton of disloyalty. In that Casey told her staff of these meetings and Carmichael admitted them to Dr. Cotton when confronted about them, the fact that Carmichael knew about the events long before Dr. Cotton notified him cannot be denied.

What can be denied is that Carmichael dealt with matter in a responsible fashion. Rather than acting in the best interest of the company, he once again put his personal insecurities first, and plotted against Dr. Cotton. Dr. Cotton's so called "failure to notify the company" serves as evidence of his fairness as a leader and his willingness to give Casey a chance, also contrary to TRHP's current assertions against Dr. Cotton. In that Carmichael already knew about the matter, any damage to the company as a result of the failure to act until Dr. Cotton notified TRHP in April, would seem to, once again, rest with Carmichael.

The weeks following the April 6 meeting saw Carmichael repeatedly attempt to resurrect his theory that Dr. Cotton was a failure and that Casey was not in the wrong. Carmichael had multiple meeting with the nursing staff in which he attempted to impress this theory upon them. The staff reacted strongly with multiple persons (Lengle, Sandy, Cerutti, Shields, and other) complaining to the compliance officer that Carmichael was mishandling the issue and was not responsive to their issues regarding Casey's mistreatment of them (now worsening in the aftermath of Dr. Cotton's rejection of her feelings) and Casey's mistreatment of Dr. Cotton. Dr. Cotton also made his own complaint to the compliance officer and was openly criticized by Carmichael for this with Carmichael stating that all issues were to be brought directly to Carmichael and that Dr. Cotton was never again to go to the compliance officer. Please forward a complete copy of all complaints filed with the compliance department concerning this issue. When Carmichael retaliated against those filing the complaints, additional complaints were filed. Please forward copies of this second round of complaints to the compliance officer. Carmichael's behavior served to create the "choosing up of sides" referred to in your previous correspondence, namely, the company against Carmichael. In support of this, note that all complaints with the compliance officer were filed after Carmichael became involved and were about Carmichael's behavior.

As Carmichael's ill-conceived plot caved in upon him, Dr. Cotton, Lengle, Sandy and others continued to carry out their duties in exemplary fashion, despite Carmichael's involvement. Review of the performance of the department during this time will show it remained exemplary, despite Carmichael's repeated intrusions.

Eventually, walled in on all sides by the truth from many person within TRHP, Carmichael terminated Casey, publicly stating that the decision was his own and based only upon his interaction with Casey. Accordingly, if TRHP now has a legal problem with Casey, it would seem to be the fault of, not surprisingly, Carmichael. TRHP's assertions that the legal problems are somehow traceable to a remark that Dr. Cotton had with his sister exhibits only that Casey was obsessively eves-dropping on Dr. Cotton, and does not impress my client. Additionally, Casey's "memoirs" that you forwarded appear to be nothing more than the saga of a rejected woman, a "saga" that has already been investigated and dismissed by TRHP. Accordingly, my client is not impressed other than it causes him to conclude that TRHP is clearly grasping at straws.

9

To concisely conclude the Casey issue: Rather than actually trying to solve the problem and protect his executive (Cotton), Carmichael was more intent on attempting to manipulate yet another situation against Dr. Cotton. A brief investigation was conducted which, as orchestrated by Carmichael, was focused solely on the allegations that were made by Casey. Please forward a complete copy of all investigation reports. As the compliance documents and investigation reports will show, and despite Carmichael's best efforts to blame Dr. Cotton for something, these claims were found to be groundless outbursts of a spurned woman.

In that TRHP has already investigated and dismissed Casey's accusations, it is again in bad faith that TRHP would now forward them as some sort of negotiation tactic.

Furthermore, and by way of indication, your reference to Dr. Cotton's characterization of Casey as "the world's best UM Director" is a partial sentence lifted out of memo on an unrelated matter. If your client shares this memo with you, you will see that the remark was not a compliment of Casey, and should again demonstrated to you that you client is relying on partial events taken out of context and perhaps only revealing select portions to you. My client is not impressed or deterred by such tactics.

The facts concerning the Casey issue will be corroborated by the multiple persons who filed complaints with the compliance officer regarding Casey's behavior toward Dr. Cotton and themselves. If we are correct in assuming that TRHP is extending the Casey matter as a reason for terminating Dr. Cotton, forward this assertion in a positive statement with TRHP signatures. Please forward a complete copy of the complaint filings of these persons and the investigation conclusion and report.

After Casey's departure, Carmichael informed Dr. Cotton that, because of Dr. Cotton's "failures" in the Casey matter, Carmichael would be more involved in the UM department. Carmichael openly overrode Dr. Cotton's decisions on whether a member's medical condition warranted a particular treatment. This assumption of medical decision making, by an accountant, shocked Dr. Cotton, Cerutti, and Lengle. Dr. Cotton had to convince Cerutti not to resign and communicated to Carmichael that Carmichael could not do this, that medical decisions had to be made by physicians, and that this behavior was exposing the company to serious liability. Carmichael would have nothing of it and called Dr. Cotton (a physician who had finished at the top of his class at Johns Hopkins) a failure who could not make proper medical decisions. As Deanne Braksator commented after observing Carmichael's behavior: "Warren is now so intimidated by Victor, he can no longer control himself."

-- LENGLE

In May, Dr. Cotton and Lengle met with Carmichael to discuss the need for reorganization of the UM department, as Casey's departure had left 13 people directly reporting to Dr. Cotton and no day to day leadership of the department. After 90 minutes of reasoning with Carmichael, they agreed that a plan would be developed that put Lengle in charge and gave her 90 days to prove herself worthy of being promoted to director. Carmichael even met with Lengle later that day to go over expectations for this 90 day plan.

All seemed well, but then, you must remember with whom Dr. Cotton and Lengle were dealing. The next day, May 11, Carmichael sent out a memo stating that the position of UM director had been removed from the company. The memo was a major betrayal of Carmichael's agreement with Dr. Cotton and Lengle, left Dr. Cotton with an unmanageable work situation,

10

Lengle with no chance of promotion, and served as yet another example of the futility of trying to communicate with or trust Carmichael. Conceived out of a desire to retaliate against Lengle for not picking Carmichael's side against Dr. Cotton and to further punish Dr. Cotton for his obvious talent and success, Carmichael's memo was a massive disservice to the company and to all involved.

On May 12, Dr. Cotton, Carmichael and Lengle met to discuss the Carmichael memo. In a pathetic display, Carmichael repeatedly attempted to lie, and when he became helplessly walled in by the truth from his own words, resorted to ad hominem attacks, referring to Dr. Cotton as "emotionally unstable," "insane," and "mentally ill." Be assured, such defamation of character will not go unaccounted for. With the facts on his and Lengle's side, Dr. Cotton was not dissuaded. After approximately 90 minutes of Dr. Cotton carefully reviewing the facts and questioning Carmichael about the truth of the matter, the truth caved in upon Carmichael and he knew his attempts at lying his way through the matter were an impossibility. Carmichael agreed to redraft the memo in a manner more consistent with the previously agreed upon terms.

Again, seemingly and predictably in character for Carmichael, Carmichael did not redraft the memo consistent with his word. Instead, he went to TRHP shareholders and accused Dr. Cotton of insubordination, being impossible to work with, and demanded that he be fired. In doing so, Carmichael, then and now, (in your most recent letter), took Dr. Cotton's very reasonable position as his own and accused Dr. Cotton as the unreasonable one. What Carmichael fails to realize is that his memo of May 11 along with Lengle's testimony will show Carmichael's position, as well as the May 12 meeting, to have been dramatically otherwise.

Were Carmichael's actions stupid? Yes, in many ways. Were they cause for TRHP liability? Yes, in many ways. Remember, counsel, that Carmichael could no longer control himself. All the evidence clearly shows the truth here, and everyone in TRHP knows it. As a result of these twisted TRHP assertions, TRHP now accuses my client of not agreeing with a position that Dr. Cotton was, in fact, advocating for. This will be quite easily established at trial. Additionally and ironically, TRHP now characterize his advocacy for this position and what was best for the company as "insubordination." The facts are quite clear and easily established.

"Tendency to attack/attack style"

For TRHP to assert that Dr. Cotton's behavior or management style was an attack style is not only diametrically opposed to Dr. Cotton's reputation, but is clearly yet another example of transference by Carmichael. As testimony, records of exit interviews by departing employees, and complaints filed with the compliance officer will show, it appears Carmichael is incapable of treating fellow professionals in an appropriate manner. Turnover in the medical department was nearly twice as high before Dr. Cotton began his tenure, than it was during his tenure. It has also come to Dr. Cotton's attention that turnover has again skyrocketed since, and in large part due to, Dr. Cottons wrongful termination. Employees receive Carmichael as non-communicative, and he comes across as offensive, intrusive, and demeaning. Employees will testify that Carmichael also seems to think he must micro-manage, and when questioned, he regularly appears to lie and occasionally retaliates, creating an atmosphere where it is difficult for anyone to work with him. Please forward a complete copy of all complaints from the Compliance Department relating to Carmichael. These professional intrusions and attacks by Carmichael regularly led to resignations. Michelle Goodman, Director of MIS, resigned after two weeks on the job. Please forward a complete copy of her employment file. Mary Mihalyo, Director of Pharmacy, began looking for a new job after two months, and resigned a few months later. Please forward a complete copy of

11

her employment file. Nancy Klimon, Director of Special Needs, presented Dr. Cotton with a resignation after an attack that occurred one month into her employment, and stayed only after much persuading by Dr. Cotton. Please forward a complete copy of her employment file. Beth Shogan, Director of UM, resigned after less than a year, after a long history of complaints about Carmichael. Please forward a complete copy of her employment file. Scott Markovich, Director of Provider Relations, had extensive discussions with Dr. Cotton regarding resignation after an attack by Mr. Carmichael. It was only then that Markovich decided to stay. Please provide a complete copy of his employment file. Both Dr. Happ and Dr. Rothchild left the company bitterly complaining that Carmichael had no respect for them as professionals, was not trustworthy, and could not be communicated with. Please forward a complete copy of Dr. Happ and Dr. Rothchild's employment file. By comparison, Dr. Cotton had a relationship with Carmichael that was not able to be achieved by the two Medical Directors immediately preceding Dr. Cotton. Even Beverly Ludlum, HR Manager, told Dr. Cotton that Carmichael had repeatedly reprimanded her for things that later became apparent had been done correctly. Beverly then stated, "Of course, he (Carmichael) never acknowledges that he was wrong and I need my job so I never bring it up. But, I do have some consolation in that he cannot look me in the eye." The list goes on, and discovery will certainly reveal additional instances of which Dr. Cotton is not now aware.

In an effort to establish some sort of reliable communication with Carmichael, Dr. Cotton met with Carmichael several times during which the two had candid discussions concerning TRHP and interpersonal issues. When Carmichael later retaliated against Dr. Cotton for trying to be constructive, Dr. Cotton decided to seek advice from others in the company about ways in which he could communicate with Carmichael. Ludlum told Dr. Cotton that it was a mistake to try to deal with Carmichael directly. She stated that he (Carmichael) gets very uncomfortable with intellectual confrontation and, if pushed, will retaliate. Mr. Horbal told Dr. Cotton that Carmichael is a liar and could not be communicated with nor trusted. Ms. Adams stated that discussions with Carmichael were not particularly effective and that it is best to simply let Carmichael do things his way until he realizes that it will not work, then perhaps he could be communicated with. The list and evidence is continuing and overwhelming, and discovery will certainly reveal more instances.

Dr. Cotton did not attack Mr. Carmichael in the referred letter to Mr. Lawson. It is a stated policy at TRHP that any employee has the right to go to the shareholders if they are unsuccessful in solving the problem internally. Accordingly, the letter to the shareholders did not constitute a violation of anything, or an attack on Carmichael. Despite the finding of the Mandella investigation, Carmichael repeatedly criticized Dr. Cotton for the matter. Dr. Cotton's assertions that the investigator's conclusions were not consistent with Carmichael's statements and criticism only served to worsen the matter and Carmichael's behavior. In response, Carmichael began ignoring Dr. Cotton's work product and was unresponsive to work related inquiries. Additionally, Carmichael launched an inappropriate attack on one of Dr. Cotton's subordinates, Nancy Klimon, that nearly drove her to resignation. This type of behavior was to become a pattern for Carmichael, namely, punishing people around Dr. Cotton. Carmichael would go weeks at a time ignoring Dr. Cotton's secretary and other key members of Cotton's staff (Anna Paglia, Amy Sandy, Donna Lengle), and his sister, April. This immaturity by Carmichael became a source of entertainment for the involved persons and they regularly joked, "Warren is ignoring me again, I wonder what Victor did right this time." Carmichael flagrantly acted inappropriately toward Dr. Cotton at a company meeting on August 17, 1998. Although Carmichael later denied doing so, the actions were witnessed by many people, including but certainly not limited to Paglia, Braksator, Quinn, Wilson, Casey, Sandy and Markovich, many of whom thereafter commented on

the clearly inappropriate and damaging spectacle. The conduct was so outrageous that many people asked Dr. Cotton things to the effect of "Why did he do that to you?" and "Are you going to quit?" With Carmichael being unresponsive to internal communications, and now behaving inappropriately in front of the whole company, Dr. Cotton sent the referred to letter. Given the behavior that Dr. Cotton was subjected to, Carmichael's inability to interact with professionals in an appropriate manner, and the above company policy of open communication, such a letter must be viewed as appropriate under the circumstances. Additionally, at the same time, Dr. Cotton and Lawson were discussing the option agreement in which Dr. Cotton would forgo present income for future reward. As you can see, the letter is an inquiry as to what the rules are going to be as they went forward. In that the agreement involved thousands of dollars and several years of his life, Dr. Cotton had every right to clarify exactly what Carmichael was attempting to accomplish.

Dr. Cotton had a fanatical following within TRHP, and people clamored to interact with him. In addition, people regularly "came out of the woodwork" to support him when he was under fire from persons like Mandella or Casey. My impression is that this seems highly unusual for a person who regularly "attacks" people, had poor "interpersonal skills" and could not "manage his team." My experience has been that persons of Dr. Cotton's purported deficiencies are usually avoided by their staff. Dr. Cotton's case is precisely the opposite. When placed next to the massive amount of evidence as to Dr. Cotton's successes, both interpersonal and financial, and his abilities as a leader, your cited instances are de minimis, not to mention out of context and untrue.

## "Washington PHO"

That TRHP chooses to highlight Washington Hospital as an example of the assertion that Dr. Cotton compromised provider relations is particularly peculiar, given the facts of the matter. It is no surprise that TRHP has never stated any adverse consequence or damage that arose as a result of the alleged "compromise," for TRHP reaped a tremendous benefit from Dr. Cotton's role in the matter.

During a December, 1998, meeting, Lawson noted that TRHP was accruing unacceptable losses in Washington County and stated that, if the losses could not be controlled, TRHP should consider not doing business there. Dr. Cotton explained that TRHP had a very unfavorable contract with the hospital and that the hospital had refused all attempts at renegotiation. Lawson instructed Dr. Cotton to do whatever he could to remedy the situation.

Having already positively moved the immovable provider (Uniontown Hospital), Dr. Cotton spent parts of the next month investigating the matter. Dr. Cotton determined that Washington had violated antitrust guidelines in the manner in which it had negotiated its contract with TRHP. Dr. Cotton sent his findings, along with the applicable DOJ/FTC guidelines on the matter to Charlton, TRHP's attorney on provider matters. The two of them discussed the matter and, at Dr. Cotton's request, Charlton reduced the matter to memo. A letter was sent to Washington. Their response amounted to a categorical denial. As a result, the now infamous meeting was scheduled. Though Carmichael never actually understood the issue, he accompanied Dr. Cotton in place of Markovich.

The meeting began with Clarke, the hospital's negotiator, denying all factual allegations previously made by TRHP and stating that the hospital would not move on its fee schedule. Dr. Cotton looked at Carmichael, who stared blankly and did not respond. Accordingly, Dr. Cotton handed Clarke a series of documents that supported TRHP's position. Each time Clarke changed

13

his story, Dr. Cotton handed him another document. Clarke lost control of himself. Eventually, Clarke's superior intervened and agreed to reconsider TRHP's requests for relief on fees. TRHP proposed a fee schedule that was 15-20% under the then current contract. Several weeks later, Washington responded with a counterproposal that was within 2% of what TRHP had proposed, and which would save TRHP hundreds of thousands of dollars a year. Additionally, in follow-up, Markovich was told that Clarke had been replaced as Washington's negotiator and that the hospital wanted to start over on better terms.

Dr. Cotton, Markovich, and the company were jubilant at this complete success. Unfortunately, sometime later, driven by a motive unfathomable by everyone else in TRHP, Carmichael began reprimanding Dr. Cotton about the matter. Understand, counsel, that it was Dr. Cotton that found and executed a way to rectify the inequitable situation, negotiated the meeting, and saved TRHP hundreds of thousands of dollars. The company was well aware of the complete success and who was to get the credit, but Carmichael could not handle yet another Dr. Cotton success. He began discrediting Dr. Cotton's abilities as an attorney and as a negotiator, and referred to the matter as a "compromise of the relationship," seemingly unable or unwilling to recognize the success. In that the relationship had taken a giant leap forward and saved TRHP a boatload of money, only someone who was afraid of Dr. Cotton's success would characterize these events as a "compromise." Carmichael seems to be the only person in TRHP who concluded the matter anything other than an uncompromised, grandiose success.

"Meetings regarding performance deficiencies"

In his efforts to further discredit Dr. Cotton, Carmichael began questioning Dr. Cotton's management. Although Dr. Cotton had no management deficiencies that led to problems at TRHP, as interviews with TRHP staff will reveal to you, Dr. Cotton did consent to Carmichael's request to work with a consultant on an as-needed basis, expressing that he was always open to self improvement, and wishing yet to improve his relationship with Carmichael. Again , not surprisingly, it was Carmichael who thought Dr. Cotton should receive training. Carmichael and Lawson promised to make such a person available; however, Carmichael quickly revoked the promise. Dr. Cotton was introduced to a Mr. Hobart, the consultant, and a brief group meeting followed. Thereafter, Dr. Cotton was not permitted to meet with Hobart. When Dr. Cotton asked Carmichael if he would be following through with his promise to make Hobart available, Carmichael indicated that he would not, stating that Dr. Cotton was a "failure beyond hope." This would not constitute "training" that Dr. Cotton "could not respond to." To state that Dr. Cotton had management deficiencies is rather silly in itself, given the facts (that are easily corroborated), and to state that Dr. Cotton did not respond to "training" is even more disconcerting.

"Choosing up sides"

Because of the assertion that Dr. Cotton's actions somehow caused people to "choose up sides," creating an us verses them attitude is a conclusion rather than a statement of fact, the assertion is of little evidentiary value. Accordingly, it is not worthy of address; however, we will do so because it offers an opportunity for further clarification, based upon the facts.

In that my client will stipulate that Carmichael was mistrusted and disliked throughout TRHP, the issue raised here is who is responsible for this phenomenon. The allegation appears to be that my client somehow turned people against Carmichael. Not only is this untrue, it is surprising that it would even be alleged. Are we to understand that this is your position that Dr. Cotton somehow (facts presumably forthcoming) manipulated droves of independent, educated

14

adults into believing something that was completely untrue about Carmichael, while Carmichael helplessly sat by as CEO, completely powerless to convey the truth?  Carmichael earned the dislike and distrust that the company felt for him, and to assert that Dr. Cotton is somehow responsible for this dislike and distrust is nonsensical.

Although there are instances too numerous to recite that could illustrate the ways in which Carmichael earned this undesirable distinction, we will discuss one particularly outrageous one.  In early 1999, a member who was in an unfortunate situation went to the media complaining about TRHP denials of payment for care.  The case involved the issuance of a denial letter over a procedural dispute with a hospital.  In accordance with TRHP policy, a letter was issued by the UM Department and had Dr. Cotton's signature at the bottom.  Unfortunately, the media blew the incident out of proportion and the story ran on KDKA.  In response, the TRHP medical department did an internal review of the case, had the DPW Medical Director review it, and no concerns were identified.

Despite this finding, Carmichael sent the member a letter in which he apologized for the conduct of the company and involved staff.  When Carmichael told Dr. Cotton and Casey about the letter, Dr. Cotton and Casey were greatly concerned about what this meant for them, as the company had left them out on a limb in the midst of a media circus.  Dr. Cotton, Casey, and the medical departments had done everything in accordance with policy, yet now Carmichael was publicly apologizing.  In preparation for impact, Casey told her senior staff about the apology and all involved worried what this might mean for them personally and professionally.

Fortunately, Dr. Cotton was able to involve Thomas in the matter and, upon Thomas' urging, the letter was retrieved from the US Mail.  Although a second, less offensive letter was drafted, shared with the staff and then sent, it was clear that Carmichael would not support his staff in times of controversy.  Please forward a copy of the original and revised letter written by Carmichael.  What was particularly sad about this matter is that it was uncertain to the entire staff what Carmichael was attempting to gain by selling out his staff, other than that the media or DPW might demand Dr. Cotton's termination.  It is clear that it was this type of action by Carmichael that undermined the team's belief and trust in Carmichael.

The facts we have detailed above are not intended to be an all inclusive list, and, because we have not yet begun discovery, the full scope of events cannot yet be ascertained.

As a guideline for your review and corroboration of the forgoing, and allow me to generally suggest the following.  Kindly:

* Review the memos from Lawson to Dr. Cotton dated September 14 and December 1, 1998.  These writings memorialize their discussions and clearly show that Dr. Cotton's option and percentage of profit agreement was a bargained for exchange.  Dr. Cotton exchanged a portion of his paycheck for future compensation.

* Survey the market for the salary of a Senior Medical Director, noting that Dr. Cotton's salary after September 30, 1998 ($150,000 and no incentive) was well below the market.

* Ask yourself how you are going to convince a jury, comprised of employees, that Dr. Cotton gave up tens of thousands of dollars in present income and agreed to work for a below market salary, in exchange for a bargain that TRHP could revoke at any time with or without cause, and owe Dr. Cotton nothing, i.e. that TRHP had made no promises to Dr. Cotton at all with

respect to Dr. Cotton's future with the company. Why would someone agree to such a situation? People just don't do this; they do not agree to situations detrimental to their interests. I think it especially difficult to convince a jury that someone as intelligent as Dr. Cotton would agree to such an illusory agreement.

* Explain why TRHP would extend such a significant financial interest in the company to someone who was (allegedly) such a marginal employee. Note that the final documents were extended to Dr. Cotton for signature in the same month he was terminated. Why would TRHP lock itself into such a deal with someone who was (allegedly) clearly failing.

* Ask Lawson why he repeatedly expressed his satisfaction with Dr. Cotton's performance, even disagreeing with some of Carmichael's assertions. Ask Lawson why, as late as one week before Dr. Cotton was terminated, Lawson told Dr. Cotton that he believed Dr. Cotton had all the tools to become a CEO of an HMO and that, in fact, he had no doubt that Dr. Cotton would achieve such a goal, yet TRHP now asserts that Dr. Cotton was unfit to hold even the position of Medical Director.

* Ask Lawson to review for you the voice mail that he left for Dr. Cotton on April 8, and the conversation he had with Dr. Cotton on April 29, 1999, both reassuring Dr. Cotton that the company was committed to him and that he was part of the long-term future of the company.

* Review the financial performance of TRHP before, during, and after Dr. Cotton's tenure.

* Calculate the staff turnover of the medical departments on a per employee per month basis, before, during and after Dr. Cotton's tenure. In making the comparison, exclude Mihalyo, whom all acknowledge was driven from the company by Carmichael.

* Survey the medical staff and obtain a general idea of Dr. Cotton's ability and reputation as a leader, his fairness, and his ability to be communicated with. Ask also these same questions about Carmichael.

* Survey any other 5 members of TRHP management and any other 5 TRHP employees their general opinion of Dr. Cotton's ability and reputation as a leader, his integrity, his interpersonal skills, his veracity, and his ability to make TRHP a great place to work. Ask these same questions about Carmichael.

* Ask Markovich, Roddy, Romeo and Vollberg, why they relied so heavily on Dr. Cotton, and in fact desired to report to Dr. Cotton, when in fact, they already reported to the CEO (Carmichael).

* Ask Markovich about Dr. Cotton's abilities with providers and the number of times he saw Dr. Cotton compromise a relationship with a provider. Ask these same questions of Denise Romeo, Claudia Roddy, Anna Paglia, and Keith Vollberg.

* Although he reported directly to Horbal and then to Carmichael, ask Markovich to whom he gives the credit for his growth as a professional and to whom he considers to be his role model.

16

\* Ask the nursing staff to comment on the sense of direction, leadership and competence that surround(ed) them before, during and after Dr. Cotton's tenure.

\* Ask Richards, Klimon, Hancovsky, Sandy, and Lengle why they came to, and stayed with TRHP.

\* Ask Dr. Cotton's assistant, Lennon, about the line of people at his door every day, with dozens of phone calls and E-mails that he dealt with in moving the company forward everyday. Compare this to the flow of traffic through Carmichael's office.

\* Ask yourself why people line up at the door of, and want to report to someone with all the alleged faults as TRHP asserts Dr. Cotton to possesses. Weren't these people afraid that Dr. Cotton would "attack" them, "turn on them" and otherwise try to "run them out of the company?"

\* Ask Markovich and Klimon to recount the attacks Carmichael committed upon them. Review the employment files and/or contact Horbol, Happ, Rothchild, Goodman, Mihalyo, Shogan, Cerutti, Sandy and Shields. Ask them to recount their experiences with Carmichael's communication and management style. Note that Carmichael has not developed a relationship with any professional.

\* Review with Ludlum the multiple inappropriate reprimands that she received from Carmichael and also his inability to "own up" to his mistakes.

\* Review with Braksator her experiences with Carmichael and also the events that led her to conclude that Carmichael is so intimidated by Dr. Cotton that he could not longer control himself.

\* Review with other TRHP executives (Adams, Horbal, Heitman) their ability to form a relationship with Carmichael.

\* Ask TRHP to define the standard by which they now deem Dr. Cotton's behavior in the Mandella matter worthy of termination when:

> - Dr. Cotton was exonerated of all wrong-doing.

> - Hogenmiller, an experienced employment lawyer and investigator in the matter, commended Dr. Cotton on his behavior.

> - Mandella was found to be obsessed with Dr. Cotton and behaved in an egregious manner.

> - Lawson himself conceded that Mandella had no sexual harassment case against TRHP.

> - TRHP had no policies on sexual harassment.

> - Every other woman who gave a statement on the matter was incredibly complimentary of Dr. Cotton's behavior and condemned Mandella.

17

* Ask Hogenmiller about his conclusions in the Mandella matter. Ask him who the persons were that he interviewed and their comments. Review the investigation reports generated therefrom. Ask Hogenmiller about the phone call he made to Dr. Cotton thereafter concerning his conclusions, and the fact that he did not consider the July 22 letter to be a personal attack.

* Ask Carmichael by what workplace sexual activity standard were Dr. Cotton's actions compared.

* Ask Carmichael by what standard he drew a different conclusion than the employment lawyer who investigated the matter.

* Ask Carmichael why he did not forward Dr. Cotton's complaint about Mandella and documents supporting his position to Hogenmiller in a timely manner. Ask Carmichael why, when Dr. Cotton presented evidence that Mandella had expressed a plan to physically harm her superior (Cotton), Carmichael suppressed this information from the investigator and let Dr. Cotton stand in harm's way for two weeks.

* Ask Braksator, Paglia, Quinn, Casey, Sandy, Lengle and Lennon about the outrageous manner in which Carmichael treated Dr. Cotton at a company meeting in August, 1998. Then, ask Carmichael why he did not address any perceived problems directly with Dr. Cotton, choosing rather to choose to publicly embarrass Dr. Cotton. Ask him to identify what those problems were in that none ever became apparent (other than his own).

* Ask Paglia, Sandy and Lennon about Carmichael's childish tactic of ignoring them for weeks at a time in an attempt to punish Dr. Cotton. Ask yourself how Dr. Cotton was to form a relationship with someone who regularly behaved in such a manner.

* Review Wetzel's employment file and note that she was terminated as a result of extensive documentation by Richards, and that she could not function within TRHP.

* Review Guffey's employment file and note Dr. Cotton's very objective concerns about patient care. Note also that she continued to make medical decisions for months thereafter. If these documents have been suppressed or destroyed, my client can provide you with copies. Ask Carmichael why he directed that Guffey continue to make medical decisions. Ask Carmichael what duty he saw to the membership.

* Review TRHP's corporate liability exposure for allowing a known drug impaired person to make medical care decisions.

* Review the multiple complaints filed with the compliance officer by Lengle, Sandy, Cerutti, Shields and others regarding Carmichael's handling of the Casey matter. Note that all the complaints were filed after Carmichael became involved and further that the complaints focus on Carmichael and Casey. Note that Dr. Cotton is not part of the controversy.

* Review with Lengle the meetings of May 10 and 12, asking her about the respective positions and behaviors of Dr. Cotton and Carmichael, relative to Lengle's promotion. Ask Lengle what was discussed and what was agreed upon between all parties. Ask Lengle what Carmichael agreed to, and what he said he would do.

18

* Review Carmichael's May 11 memo regarding the organization and leadership of the UM department relative to what he now states that his position was on the matter. If this memo has been suppressed or destroyed, my client can provide it for you.

* Ask Lengle why she believes Carmichael could not go along with a plan that was clearly in the best interests of TRHP (because the plan would result in the promotion of Lengle, a person who had filed complaints with the compliance officer regarding Carmichael's handling of Casey's behavior).

* After you have spoken to Lengle and reviewed the memo, ask Carmichael why he had to fabricate a "final blow" to terminate Dr. Cotton. If Dr. Cotton was truly failing, why not just wait for him to make a legitimate mistake? Given the alleged deficiencies, a horrendous mistake would undoubtedly be just around the corner. If Carmichael was truly trying to help Dr. Cotton, why did he have to make this up?

* Ask Carmichael why he did not become involved in the Casey matter when she first started to complain to him. Though repeatedly falsely berating Dr. Cotton for not following proper procedure, Carmichael clearly erred when he did not inform Dr. Cotton of the matter and attempt to help him solve it.

* Ask Carmichael on what basis he attributed an incontrovertible, violent crime against Dr. Cotton to a management failure by Dr. Cotton.

* Review the memo in which it is alleged that Dr. Cotton described Casey as "the worlds best UM director." Note that these are lifted out of context from a discussion about another matter, and were not a compliment of Casey. In choosing to read this remark as a compliment of Casey, TRHP is either grasping at straws or cannot properly read a compound sentence.

* Review with your client that, as a result of deplorable handling of the Casey matter, Carmichael drove three of the four top nurses from the company: Sandy, Cerutti, and Shields.

* Review with Cerutti and Lengle that Carmichael overrode Dr. Cotton's medical decisions.

* Ask Carmichael what training and regulation that he relied upon when he chose to override medical decisions of a physician, exposing TRHP to liability by doing so. Also ask him what duty he owed the membership in assuming this responsibility.

* Review with Carmichael what education he has that qualifies him to make any medical decisions concerning patient care.

* Review TRHP's corporate liability exposure for allowing an accountant to make medical care decisions, overriding the physicians orders.

* Review the Washington file. Review with Charlton that it was Dr. Cotton's theory upon which the events proceeded. Review with Markovich the historical events surrounding the contract and renegotiation. Review with Carmichael his understanding of antitrust law as it relates to provider negotiations and the extent to which he understood what was being said in the infamous meeting. Ask Carmichael what definition of "compromise" he is using when he deems the Washington events a compromise.

* Ask Lawson and Markovich how it is that Carmichael allowed TRHP to be negotiated into a financially compromising contract with Washington.

* Ask Markovich about his follow-up conversations with Washington and Dr. Cotton.

* Ask Carmichael how he felt when, as a result of the extraordinary and exemplary manner in which Dr. Cotton prepared for and conducted himself in the meeting, Washington sent TRHP a proposal that was within 2% of TRHP's proposal, and which saved TRHP hundreds of thousands of dollars over the existing agreement with Washington.

* Ask Carmichael how it felt when someone with superior education, intelligence, morals, personality, business sense, and charisma was in his presence every day. If he is unable to answer, ask Braksator.

* Review with Ludlum that Dr. Cotton twice complained to her that he objected to Carmichael's statements about his mental health and also that Carmichael was making business decisions based upon these Carmichael-presumed diagnoses.

* Review with Carmichael the clinical signs and the training upon which he relied when making these diagnoses of Dr. Cotton's psychiatric condition.

* Review with Carmichael what education he relied upon in making his clinical diagnosis of Dr. Cotton's psychiatric condition.

* Review with your client that proclaiming that an employee has a psychiatric condition that interferes with their ability to do their job, and then terminating that person as a result thereof constitutes a violation of the ADA, even if that person has no such disorder, as is the case here.

As you so correctly stated, counsel, as attorneys we are only as knowledgable of the facts as our client allows us to be. Hopefully, as you review the above with your client, the facts will become clear to you. The above detailed factual account is offered in humble good faith with the hope that it will give you, as counsel, a window to the truth, and will further expedite a resolution to this matter. It should help you know what to review with your client and its employees, and where to find the supporting documentation, when available, and when they have not been destroyed. Dr. Cotton is quite certain that documents under the control of Carmichael will be "lost."

As you can see, TRHP assertions do not withstand scrutiny and that Carmichael's actions have again placed TRHP in a vulnerable position. Please understand, counsel, that while Dr. Cotton would prefer not to litigate this matter, he is patiently tenacious, and will see this matter through to the end to prove his point and receive his vindication. His veracity and support within TRHP is unquestionable. Dr. Cotton has the undying support of the vast majority of TRHP administration, executives, and employees. No less then 25 TRHP personnel have privately contacted Dr. Cotton, since his termination, vowing their support in any manner necessary as he pursues these actions against TRHP to recover his damages. Many others have contacted Dr. Cotton to express their thanks and gratitude for working or being in contact with him, expressing their sorrow at is departure, and condemning his deplorable treatment at the hands of TRHP. Many others continue to keep Dr. Cotton informed as to the general condition of TRHP.

20

Unfortunately, it appears that TRHP has taken a dramatic turn for the worse since Dr. Cotton's termination, both fiscally and as far as workplace conditions and morale.

Doubtless TRHP understands, that discovery will be extensive and that all aspects of TRHP's personnel and operations will be on trial, not Dr. Cotton's work history and ability. The facts clearly support this being the case. All current and former employees will need to be deposed and called to testify because of Dr. Cotton's alleged "management deficiencies" and "psychiatric conditions," and because of Carmichael's actions. All of the providers will need to be deposed and called to testify because of Dr. Cotton's alleged "compromise of provider relations." Dr. Cotton's list of persons and providers is quite lengthy, but suffice it to say, the list necessarily encompasses everybody now or formerly associated with TRHP.

With the above you should now be aware, if you were not already, that Carmichael has exposed TRHP to liability many times, and that a vast, vast majority of the company has a very difficult time with him. Not only has Carmichael exposed TRHP to liability now and in the past, doubtless he will do so again. For TRHP's best interests, it is probably prudent for to send this correspondence through the proper channels to Attorney Thomas then to Attorney Lawson, then to Carmichael, so as to receive the truth. I can assure you that your review of the above facts will reveal our position to be correct. Sending this correspondence through Lawson will also ensure that this matter, and the severity hereof, will be reported to the Dobbs family. For TRHP's bests interests, Dr. Cotton would prefer not to have the majority shareholders find out about this matter through the media at the filing of the lawsuit. The Dobbs family were and are quite familiar and impressed with Dr. Cotton's abilities, and his accomplishments for the benefit of TRHP. They will be quite concerned with TRHP's current extension of liability.

Kindly discuss with your client that TRHP is dealing with, at a minimum, a breach of contract action including retaliation, an ADA violation, and multiple tort actions. Additionally, individual tortfeasors will be held personally liable. This sends the case into punitive damages. Overcoming all of these will require a showing of good cause for the termination, not simply a finding of a mistake on Dr. Cotton's part. To this point, TRHP has not even identified a mistake. Good cause would also necessitate that company policy have been followed with respect to Dr. Cotton's dismissal, which it was not. Recognize that at a minimum, Dr. Cotton had a right to rely on these policies as part of the agreement. Recognize that by Dr. Cotton working at a below market rate as a result of the bargained for exchange, TRHP was becoming progressively more indebted to Dr. Cotton every day. Accordingly, the showing of good faith would need to be a strong one. To the contrary, what exists here is repeated bad faith.

In conclusion, the evidence will show that Dr. Cotton and TRHP had a long term contract. Dr. Cotton's option and percentage of profits agreement was a bargained for exchange for which Dr. Cotton gave significant consideration by forgoing accrued current income. Dr. Cotton performed his duties in an exemplary fashion. TRHP breached its contract with Dr. Cotton. TRHP retaliated against Dr. Cotton by its actions and wrongful termination. Additionally, culpable TRHP executives are personally liable for their multiple torts which have exposed TRHP to its corporate liability. TRHP had no good cause for terminating Dr. Cotton.

TRHP's (and Carmichael's personally) actions were intentional, retaliatory, inexcusable, and damaging. Everyone in the company knows the facts here, although they fear Carmichael. The facts are clear, and extracting the testimonial and documentary evidence will prove to be simple. Most of TRHP's apparent defense will rest on Carmichael's unsubstantiated opinions, which will not be corroborated by anyone, within or without TRHP, and whose reputation within

TRHP and veracity do not approach those of Dr. Cotton.  Dr. Cotton is extremely confidant with his case in this matter, and is not concerned about going to trial, but, again, it is Dr. Cotton's hope that we don't have to go this far.  As you can easily see, however, Dr. Cotton is quite prepared to do so.

Dr. Cotton willing to allow you time to review the above facts, so you can further analyze your client's legal position and forward a settlement offer that is reasonable.  Dr. Cotton is also confidant that once you, as counsel, review the above facts and fully discuss them with your client, you will agree that Dr. Cotton's offer is reasonable, and will advise them accordingly.  Dr. Cotton is again extending his offer in settlement in the amount of $175,000.

Dr. Cotton's proposal of $175,000 contained in my last correspondence represents a fair settlement in this matter.  Given the strength of his case, and the time necessitated in arriving at an agreement due to your client's attempts at stonewalling, I have encouraged Dr. Cotton to increase his demands, but he felt that the process could be more easily concluded if we stay with his last settlement offer.  As you can see from the manner at which Dr. Cotton arrived at his last settlement offer, Dr. Cotton has already afforded TRHP a significant reduction from its potential exposure, and has basically offered to "split the difference."  After you have reviewed the above, I am confidant that you will find Dr. Cotton's settlement offer to be one upon which we can agree.

I stand by for your response and to assist in any manner possible.

Sincerely,

Douglas P. Lehman, Esq.
Lehman & Lehman, Attorneys-at-Law

cc: Dr. Victor Cotton

22

# Kirkpatrick & Lockhart LLP

Payne Shoemaker Building
240 North Third Street
Harrisburg, PA 17101-1507
717.231.4500
www.kl.com

May 29, 2001

David R. Fine
717.231.5820
Fax: 717.231.4501
dfine@kl.com

**BY TELECOPIER ONLY**

William E. Haggerty, Esq.
240 North Duke Street
Lancaster, PA 17602

        Re:    *Cotton v. Three Rivers Health Plans, Inc.*

Dear Mr. Haggerty:

        This letter is a follow-up to our correspondence and discussion of the last several days.

        We agreed that we would conclude Dr. Cotton's deposition in Pittsburgh during the same block of days in which Three Rivers produces the witnesses you have requested for deposition. We would suggest the following schedule:

<u>Tuesday, June 5, 2001</u>

9:00 a.m. – noon: Continuation of Dr. Cotton's deposition.
12:30 p.m. – 6:00 p.m.: Depositions of Warren Carmichael and William Lawson.

<u>Wednesday, June 6, 2001</u>

8:30 a.m. – 10:00 a.m.: Deposition of Beverly Ludlum
10:00 a.m. – 1:00 p.m.: Deposition of David Thomas
1:30 p.m. – 2:30 p.m.: Deposition of Scott Markovich
2:30 p.m. – 3:30 p.m.: Deposition of Lewis Perry

        As you can see, I have estimated somewhat the duration of your depositions, presuming that you will take longer with Mr. Carmichael, Mr. Lawson and Mr. Thomas (and, correspondingly, less time with Ms. Ludlum, Ms. Markovich and Mr. Perry). Please let me know immediately if these times seem off base. In any event, while my schedule requires me to travel to Philadelphia at the end of the day on June 6, my colleague, Mark Rush, is available the morning of June 7 to complete any depositions not completed on June 6. We would propose that the depositions all take place at Three Rivers' facility in Monroeville so as to reduce the time loss and inconvenience associated with witnesses traveling into and out of Pittsburgh.

**EXHIBIT**

*C*

P.2/3

MAY 29 '01 02:00PM 1

**Kirkpatrick & Lockhart** LLP

William E. Haggerty, Esq.
May 29, 2001
Page 2

Your correspondence also requested a deposition of John Dobbs. As I told you on the telephone, Mr. Dobbs works and resides in Tennessee. Moreover, he had no substantive role in any of the matters alleged in the complaint (or in the answer). Accordingly, if Dr. Cotton insists on a deposition of Mr. Dobbs, we will seek a protective order. Please let me know if Dr. Cotton is aware of some way in which Mr. Dobbs' testimony would be relevant that I do not know.

As I told you on the telephone (and as alleged in the complaint), Ms. Guffy and Ms. Casey are no longer employees of Three Rivers and we cannot produce them for deposition. If Dr. Cotton wishes to take their depositions, he will have to serve subpoenas on them. If you elect to do so, we would very much appreciate your consulting with us about the scheduling of those depositions. Similarly, Mr. Horbol is not within the control of Three Rivers and, so, a subpoena will be necessary (although, as with Mr. Dobbs, we are unaware of any way in which Mr. Horbol might offer relevant testimony). As we discussed, John Donovan is outside counsel and both practices and resides outside of Pennsylvania (thus, we cannot produce him).

Finally, Dr. Cotton requested a corporate designee. As we discussed this morning, you will provide a Rule 30(b)(6) notice so that Three Rivers can know the topics for which that witness should be prepared to testify. Given that we do not yet have such a notice, I suspect that the Rule 30(b)(6) deposition will have to wait beyond next week.

On the telephone this morning, you mentioned that you have filed praecipes for writs of summons against other Three Rivers corporate entities. Please let me know as soon as possible which entities those are (perhaps by faxing the praecipes). We may be able to reach a stipulation that allows you to withdraw those actions while still protecting your client's interests.

I will look forward to seeing you soon.

Very truly yours,

David R. Fine

cc:    Douglas P. Lehman, Esq. (by Telecopier only)
       David W. Thomas, Esq. (by Telecopier only)



**FILE COPY**



# HAGGERTY LAW FIRM

240 N. DUKE STREET
P.O. BOX 1527
LANCASTER, PA 17608-1527

717.397.3200
FAX: 717.397.3724
email@haggertylaw.com

*BOARD CERTIFIED TRIAL SPECIALIST*
WILLIAM E. HAGGERTY

*LEGAL ASSISTANTS*
HELEN L. SHAUBACH, CLA
DENNIS R. SITLER, CLA
TANNIA L. CARPENTER
DONNA L. COMP

August 14, 2001

**VIA FACSIMILE: 231-4501**

David R. Fine, Esquire
Kirkpatrick & Lockhart
240 North Third Street
Harrisburg, PA 17101-1507

    **Re:**    **Cotton v. Three Rivers Health Plans et al.**

Dear David:

    As a supplement to Plaintiff's discovery responses, the Plaintiff identifies Kelly Lennon and Amy Sandy as persons with knowledge of events and information related to the above litigation.

        Very truly yours,

        /s/ William E. Haggerty

WEH:kae

cc:    Emmett R. Lehman, Esquire (Via Facsimile: 392-3838)
      Victor R. Cotton, M.D.



EXHIBIT
D

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

VICTOR R. COTTON,                       :

    Plaintiff,                        :

    v.                                :      No. 1:CV-00-1709

THREE RIVERS HEALTH PLANS, INC.         :
and WARREN CARMICHAEL                    :

    Defendants.                       :
                                      :

## RESPONSES OF DEFENDANT THREE RIVERS HEALTH PLANS, INC. TO PLAINTIFF'S INTERROGATORIES (SET NO. 1)

### GENERAL OBJECTION

The number of interrogatories posed, including subparts, exceeds the number allowed by the Federal Rules of Civil Procedure, the local rules of this court and the joint case-management plan. Although Three Rivers will attempt to respond to all interrogatories that are not otherwise objectionable, in doing so it does not waive its right to assert this general objection.

### GENERAL RESERVATION OF RIGHTS

Three Rivers reserves the right to supplement any of the following responses in accordance with Fed. R. Civ. P 26(e). In addition, although Three Rivers will attempt to respond to all interrogatories that are not otherwise objectionable, Three Rivers specifically reserves the right to supplement any contention interrogatories at the conclusion of discovery. *See* Fed. R. Civ. P 33(c).



EXHIBIT
" 3 "

HA-101407 v1 0220565-501

1.      State the existence *and terms* of any insurance agreement or self-insurance plan which may be liable to satisfy part or all of a Judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the Judgment.

ANSWER:

None.

2.      Please state the make, model, type and all other information necessary to correctly identify *all* computer hardware and software used at TRHP for billings, word processing and all office management data recording procedures and administration.

ANSWER:

Objection.  This interrogatory seeks information that is not relevant to any claim or defense in this case and that is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, this interrogatory is overbroad and unduly burdensome.

3.      Identify each person (expert, lay opinion or employee) by name, address and telephone number, whom you or your attorneys expect to call as a witness at trial on matters relating to liability and/or damages, and to what they will testify.

ANSWER:

Defendants have not yet determined what witnesses they may call as witnesses at the trial of this case.

4.      Identify all documents, photographs, photocopies, facsimiles, computer programs or disks, computer stored information, motion pictures, or videotapes, including negatives, diagrams, models, and any other documentary evidence that you or your attorneys will identify, refer to or move into evidence at the trial of this case, or move into evidence relevant to the representation of Defendant.

ANSWER:

Defendants have not yet determined what documents they may use at the trial of this case.

2

5.    If you contend that Dr. Cotton was terminated for cause, identify (as d **DEFINITIONS**, above) with specificity each and every fact that supports your conte witnesses who will testify to the fact and documents upon which you will rely in pro.... fact.

ANSWER:

Objection.  This interrogatory is vague in that it does not define "specificity."  Subject to that objection, and without waiving it, Three Rivers offers the following response.  Because of the lack of a definition of "specificity," Three Rivers does not concede that the following response is exhaustive:

Dr. Cotton was an at-will employee and, although no cause was required as a matter of law, he was terminated for cause.

a.    Dr. Cotton displayed an inability to work with other employees of Three Rivers and with members of the management team.  Dr. Cotton inaccurately disparaged his colleagues and his supervisors and, among other things, irreparably damaged his ability to serve as a manager.

Potential, relevant witnesses on this issue would include Warren Carmichael, William Lawson, Beverly Ludlum, David Thomas, Pat Casey, Peggy Wetzel, Jill Guffy and Danette Mandella.  Potentially relevant documents include correspondence between Dr. Cotton and Mr. Lawson, memoranda generated by Dr. Cotton, memoranda regarding Dr. Cotton and electronic-mail messages from, to or about Dr. Cotton.

b.    Dr. Cotton displayed poor business judgment with regard to conduct in which he engaged that exposed the corporation to liability.

Potential, relevant witnesses on this issue would include Warren Carmichael, William Lawson, Beverly Ludlum, David Thomas, Danette Mandella, Pat Casey, Lori Shields, Deb Cerutti, April Cotton, Amy Sandee, Donna Lengle, Jerry Hogenmiller and John Donovan.

Potentially relevant documents include documents related to investigations of Dr. Cotton's conduct regarding Ms. Mandella and Ms. Casey.

c.    Dr. Cotton was insubordinate with his supervisors including, but not limited to, Mr. Carmichael.

Potential, relevant witness would include Mr. Carmichael, Mr. Lawson and Ms. Lengle.

Potentially relevant documents would include Mr. Carmichael's contemporaneous memoranda.

3

    d.     Dr. Cotton exercised poor judgment in his dealings with Three Rivers' providers both during contract negotiations and during the utilization-review process.

Potential, relevant witnesses would include Mr. Carmichael and Leslie Gelpi.

Potentially relevant documents would include contemporaneous internal memoranda and correspondence from providers.

    6.     If you contend that Dr. Cotton's employment was at-will, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Dr. Cotton's employment was at-will. The facts supporting that conclusion include, but are not limited to, the following:

    1.     The employee handbook provided to Dr. Cotton and all other Three Rivers employees specifies that all Three Rivers employees are at-will unless an authorized corporate officer signs a document specifying otherwise. There is no such document that would change Dr. Cotton's status.

    2.     The stock-option agreement entered into between Three Rivers and Dr. Cotton expressly notes that it does not "alter or modify any terms or conditions of employment."

    3.     There is no document that imposes a "for cause" requirement for termination of Dr. Cotton.

    4.     There is no document that establishes a fixed term of employment for Dr. Cotton.

Relevant documents include the Three Rivers employee handbook, the stock-option agreement and any documents related to the negotiation and execution of that stock-option agreement. Relevant, potential witnesses include William Lawson, Warren Carmichael, Beverly Ludlum and Anthony Horbal.

7.      If you contend that Dr. Cotton was terminated in part because he attacked or lashed out at other persons within TRHP, verbally or in writing, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Objection.  This interrogatory is vague in that it fails to define "attacked" or "lashed out." Subject to that objection, and without waiving it, see response to Interrogatory No. 5, which is incorporated by reference.

8.      If you contend that Dr. Cotton exhibited job performance deficiencies of any kind, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

See response to Interrogatory No. 5, which is incorporated by reference.

9.      Identify (as defined in **DEFINITIONS**, above) with specificity any training provided to Dr. Cotton during Dr. Cotton's tenure at Three Rivers Health Plans and witnesses who will testify to the fact and documents upon which you will rely in proving the training occurred.

ANSWER:

Objection.  The information requested in this interrogatory is as available to Plaintiff as it is to Defendants.

10.     In you contend that Dr. Cotton compromised provider relations or was too aggressive with providers, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving the fact.

ANSWER:

Objection.  The interrogatory is vague in that it does not define "too aggressive."  Subject to that objection, and without waiving it, see response to Interrogatory No. 5, which is incorporated by reference.

11.     If you contend that Dr. Cotton created an us verses them attitude within TRHP or Dr. Cotton's departments, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Objection.  The interrogatory is vague in that it does not define "an us verses them attitude."  Subject to that objection, and without waiving it, see response to Interrogatory No. 5, which is incorporated by reference.


12.     If you contend that Dr. Cotton's management style was too hard on people or resulted in excessive turnover within TRHP or Dr. Cotton's departments, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Objection.  The interrogatory is vague in that it does not define "too hard on people."  Subject to that objection, and without waiving it, Three Rivers responds as follows:  Turnover of employees in departments over which Dr. Cotton had authority was high.  In addition, see response to Interrogatory No. 5, which is incorporated by reference.

Relevant, potential witnesses include Beverly Ludlum.  Relevant, potential exhibits include summaries of employee turnover in the relevant departments during the relevant time period.


13.     If you contend that Dr. Cotton breached the trust or lost the confidence of TRHP executives or shareholders, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

See response to Interrogatory No. 5, which is incorporated by reference.

14.     If you contend that Dr. Cotton had problems with his last three employers prior to coming to TRHP, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

At this point in discovery, Three Rivers is without sufficient information to respond to this contention interrogatory.  If, after discovery, Three Rivers makes such a contention, it will seasonably supplement this response.

15.     If you contend that Dr. Cotton and Carmichael could not see eye to eye, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Objection.  The interrogatory does not define "see eye to eye."  Subject to that objection, and without waiving it, see response to Interrogatory No. 5, which is incorporated by reference.

16.     If you contend that Dr. Cotton's departments were in chaos, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Objection.  The interrogatory does not define "chaos."  Subject to that objection, and without waiving it, see response to Interrogatory No. 5, which is incorporated by reference.

17.     Identify (as defined in **DEFINITIONS**, above) with specificity each and every record or document you maintained with respect to the termination of Dr. Cotton.

ANSWER:

Objection.  The interrogatory seeks information subject to the attorney-client privilege or the work-product doctrine.  Three Rivers will produce responsive, non-privileged documents within its possession, custody or control.

18.    Identify (as defined in **DEFINITIONS**, above) with specificity each and every organ transplant recipient or potential organ transplant recipient who has dissenrolled from TRHP membership.

ANSWER:

Objection. This interrogatory seeks information of a confidential nature.


19.    If TRHP has ever been involved in any other legal action, whether or not the action was filed, either as a Defendant or a Plaintiff, relative to employee/employer matters or TRHP's termination of an employee or an employee resignation, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact, witness and document relative to the action through resolution of the matter and who will testify to the fact and documents upon which you will rely in proving the fact.

ANSWER:

Objection. This interrogatory seeks information that is not relevant to any claim or defense in this case and that is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, the interrogatory seeks information of a confidential nature. In addition, the interrogatory seeks information subject to the attorney-client privilege or the work-product doctrine. Further, the interrogatory is overbroad and unduly burdensome.


20.    If TRHP has ever received any complaints, inquiries or correspondence of any form, oral or written, from any person(s), or governmental unit(s) relating in any way to TRHP's business or business dealings or methods of operation or business, or delivery of health care in fulfillment of TRHP's obligations under its contracts with the State of Pennsylvania and the United States of America, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact, witness and document relative to the complaint, inquiry or correspondence through resolution of the matter and who will testify to the fact and documents upon which you will rely in proving the fact.

ANSWER:

Objection. This interrogatory seeks information that is not relevant to any claim or defense in this case and that is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, the interrogatory seeks information of a confidential nature. In addition, the interrogatory seeks information subject to the attorney-client privilege or the work-product doctrine. Further, the interrogatory is overbroad and unduly burdensome. Also, the documents

requested are as easily obtained by Plaintiff as by Three Rivers. Subject to those objections, and without waiving them, Three Rivers has no contract with the United States government.

21.    If any city official, governmental official, governmental representative, governmental agent, or any other similar public official has ever conducted an inquiry, investigation, study, or other similar analysis of TRHP relative to the business or business dealings or methods of operation or business of TRHP relative to TRHP's contracts with the Commonwealth of Pennsylvania and the United States of America or disenrollment of organ transplant candidates, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact, witness or document relative to the inquiry, investigation, study or analysis through resolution of the matter and who will testify to the fact and what documents upon which you will rely in proving the fact.

ANSWER:

Objection. This interrogatory seeks information that is not relevant to any claim or defense in this case and that is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, the interrogatory seeks information of a confidential nature. In addition, the interrogatory seeks information subject to the attorney-client privilege or the work-product doctrine. Further, the interrogatory is overbroad and unduly burdensome. Also, the documents requested are as easily obtained by Plaintiff as by Three Rivers. Subject to those objections, and without waiving them, Three Rivers has no contract with the United States government.

22.    If you contend that persons complained to TRHP about Dr. Cotton's work performance, management style, communication style, or inability to properly work with Dr. Cotton, or otherwise voicing dissatisfaction with Dr. Cotton's performance, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving the fact.

ANSWER:

See response to Interrogatory No. 5, which is incorporated by reference.

23.    If any persons have complained to TRHP abut Carmichael's work performance, management style, communication style, or inability to properly work with Carmichael, or otherwise voicing dissatisfaction with Carmichael's performance, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving the fact.

ANSWER:

Objection. This interrogatory seeks information that is not relevant to any claim or defense in this case and that is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, Three Rivers has made no such contention in this case.

24.    Describe the degree to which TRHP's knowledge that Dr. Cotton had previously engaged in whistleblowing activities by serving as an FBI informant against a prior employer heightened TRHP's concern that Dr. Cotton was indeed preparing to invoke government action, witnesses who will testify to the fact and documents upon which you will rely in proving the fact.

ANSWER:

Objection. This interrogatory is improper. Subject to that objection, and without waiving it, Three Rivers was not aware of Dr. Cotton's alleged "whistleblowing activites" at the time of his termination.

25.    Describe with specificity the purpose of limiting Dr. Cotton's profit sharing and eliminating his incentive program in lieu of the granting of the option agreement, witness who will testify to the fact and documents upon which you will rely in proving the fact.

ANSWER:

Objection. This interrogatory seeks information that is not relevant to any claim or defense in this case and that is not reasonably calculated to lead to the discovery of admissible evidence. Subject to that objection, and without waiving it, Pennsylvania's Act 68 limits "financial incentives" for physicians. In addition, at the time Three Rivers modified Dr. Cotton's profit sharing, there were proposed regulations of the federal Health Care Financing Administration that reflected the same mandate.

KIRKPATRICK & LOCKHART LLP

_____

David R. Fine
Pa. Supreme Ct. No. 66742

240 North Third Street
Harrisburg, PA 17101
(717) 231-4500

Date: April 23, 2001

Mark A. Rush
Jill D. Helbling
Kirkpatrick & Lockhart LLP
The Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
(412) 355-6500

*Attorneys for Defendants*
*Three Rivers Health Plans, Inc.*

## **VERIFICATION**

I verify under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.  I am authorized to sign this verification on behalf of Three

Rivers Health Plans, Inc.


_____
Warren Carmichael
as Chief Executive Officer of
Three Rivers Health Plan, Inc.


April 17, 2001

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of April 2001, I served a true and correct copy of

the foregoing document by overnight courier upon the following person:

Douglas P. Lehman, Esq.
Lehman & Lehman
230 North Duke Street
Lancaster, PA  17602

David R. Fine

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VICTOR R. COTTON,

       Plaintiff,

         v.

THREE RIVERS HEALTH PLANS, INC.,

       Defendant.

:
:
:
:
:
:
:
:
:

No. 1:CV-00-1709

---

## SUPPLEMENT TO THE RESPONSES OF DEFENDANT THREE RIVERS HEALTH PLANS, INC., TO PLAINTIFF'S INTERROGATORIES (SET NO. 1)

---

3.      Identify each person (expert, lay opinion or employee) by name, address and telephone number, whom you or your attorneys expect to call as a witness at trial on matters relating to liability and/or damages, and to what they will testify.

ANSWER:

Defendants may call any of the following as witnesses at the trial of this case:

Warren Carmichael.  Mr. Carmichael may testify about any of the matters described in the complaint, about any matters addressed in his deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

William Lawson.  Mr. Lawson may testify about any of the matters described in the complaint, about any matters addressed in his deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

**EXHIBIT**

"F"

David Thomas. Mr. Thomas may testify about any of the matters described in the complaint, about any matters addressed in his deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Beverly Ludlum. Ms. Ludlum may testify about any of the matters described in the complaint, about any matters addressed in her deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Anna Paglia. Ms. Paglia may testify about any of the matters described in the complaint, about any matters addressed in her deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Jill Guffy. Ms. Guffy may testify about any of the matters described in the complaint, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Jennifer Adams. Ms. Adams may testify about any of the matters described in the complaint, about any matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Patricia Casey. Ms. Casey may testify about any of the matters described in the complaint, about any matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Peggy Wetzel. Ms. Wetzel may testify about any of the matters described in the complaint, about any matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Donna Lengle. Ms. Lengle may testify about any of the matters described in the complaint, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Scott Markovich.  Mr. Markovich may testify about any of the matters described in the complaint, about any matters addressed in his deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Dr. Kit Gorton.  Dr. Gorton may testify about any of the matters described in the complaint, about any matters addressed in Dr. Cotton's deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Dr. Mark Richards.  Dr. Richards may testify about any of the matters described in the complaint, about any matters addressed in Dr. Cotton's deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Dr. Joseph Sheridan.  Dr. Sheridan may testify about any of the matters described in the complaint, about any matters addressed in Dr. Cotton's deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Mark S. Lelinski.  Mr. Lelinski may testify about any of the matters described in the complaint, about any matters addressed in Dr. Cotton's deposition, about any of the matters addressed in Three Rivers' answer or about any of the matters addressed in documents produced by Three Rivers in this litigation.

Victor R. Cotton.    Dr. Cotton may be called as on cross.

Three Rivers reserves the right to call as witnesses any of the other persons it identified in its response to Plaintiff's Interrogatory No. 5.

4.    Identify all documents, photographs, photocopies, facsimiles, computer programs or disks, computer stored information, motion pictures, or videotapes, including negatives, diagrams, models, and any other documentary evidence that you or your attorneys will identify, refer to or move into evidence at the trial of this case, or move into evidence relevant to the representation of Defendant.

3

ANSWER:

Objection.  This interrogatory seeks documents subject to the work-product immunity doctrine.  Subject to this objection, and without waiving it, Three Rivers may offer as exhibits at the trial of this case any documents produced by either party during discovery, any documents shown to witnesses during depositions, any documents produced by third parties subject to subpoenas or any other relevant documents discovered by Three Rivers after the date of this supplementation.  Three Rivers will produce an exhibit list as required by the local rules of court.

5.    If you contend that Dr. Cotton was terminated for cause, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Objection.  This interrogatory is vague in that it does not define "specificity."  Subject to that objection, and without waiving it, Three Rivers offers the following response.  Because of the lack of a definition of "specificity," Three Rivers does not concede that the following response is exhaustive:

Dr. Cotton was an at-will employee and, although no cause was required as a matter of law, he was terminated for cause.

a.    Dr. Cotton displayed an inability to work with other employees of Three Rivers and with members of the management team.  Dr. Cotton inaccurately disparaged his colleagues and his supervisors and, among other things, irreparably damaged his ability to serve as a manager.

Potential, relevant witnesses on this issue would include Warren Carmichael, William Lawson, Beverly Ludlum, David Thomas, Pat Casey, Peggy Wetzel, Jill Guffy and Danette Mandella.  Potentially relevant documents include correspondence between Dr. Cotton and Mr. Lawson, memoranda generated by Dr. Cotton, memoranda regarding Dr. Cotton and electronic-mail messages from, to or about Dr. Cotton.

b.    Dr. Cotton displayed poor business judgment with regard to conduct in which he engaged that exposed the corporation to liability.

Potential, relevant witnesses on this issue would include Warren Carmichael, William Lawson, Beverly Ludlum, David Thomas, Danette Mandella, Pat Casey, Lori Shields, Deb Cerutti, April Cotton, Amy Sandee, Donna Lengle, Jerry Hogenmiller and John Donovan.

4

Potentially relevant documents include documents related to investigations of Dr. Cotton's conduct regarding Ms. Mandella and Ms. Casey.

      c.    Dr. Cotton was insubordinate with his supervisors including, but not limited to, Mr. Carmichael.

Potential, relevant witness would include Mr. Carmichael, Mr. Lawson and Ms. Lengle.

Potentially relevant documents would include Mr. Carmichael's contemporaneous memoranda.

      d.    Dr. Cotton exercised poor judgment in his dealings with Three Rivers' providers both during contract negotiations and during the utilization-review process.

Potential, relevant witnesses would include Mr. Carmichael and Leslie Gelpi.

Potentially relevant documents would include contemporaneous internal memoranda and correspondence from providers.

Three Rivers supplements each of the foregoing responses by incorporating by reference the deposition testimony of Dr. Cotton, Mr. Thomas, Mr. Carmichael and Mr. Lawson.

      6.    If you contend that Dr. Cotton's employment was at-will, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Dr. Cotton's employment was at-will.  The facts supporting that conclusion include, but are not limited to, the following:

      1.    The employee handbook provided to Dr. Cotton and all other Three Rivers employees specifies that all Three Rivers employees are at-will unless an authorized corporate officer signs a document specifying otherwise.  There is no such document that would change Dr. Cotton's status.

      2.    The stock-option agreement entered into between Three Rivers and Dr. Cotton expressly notes that it does not "alter or modify any terms or conditions of employment."

      3.    There is no document that imposes a "for cause" requirement for termination of Dr. Cotton.

4.    There is no document that establishes a fixed term of employment for Dr. Cotton.

Relevant documents include the Three Rivers employee handbook, the stock-option agreement and any documents related to the negotiation and execution of that stock-option agreement.  Relevant, potential witnesses include William Lawson, Warren Carmichael, Beverly Ludlum and Anthony Horbal.

Three Rivers supplements each of the foregoing responses by incorporating by reference the deposition testimony of Dr. Cotton, Mr. Thomas, Mr. Carmichael and Mr. Lawson.

14.    If you contend that Dr. Cotton had problems with his last three employers prior to coming to TRHP, identify (as defined in **DEFINITIONS**, above) with specificity each and every fact that supports your contention, witnesses who will testify to the fact and documents upon which you will rely in proving that fact.

ANSWER:

Three Rivers contends that Dr. Cotton may have had workplace difficulties with previous employers.  Three Rivers' investigation is continuing.

KIRKPATRICK & LOCKHART LLP

David R. Fine
Pa. Supreme Ct. No.  66742
240 North Third Street
Harrisburg, PA  17101
(717) 231-4500

Mark A. Rush
Jill D. Helbling
Kirkpatrick & Lockhart LLP
The Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222-2312
(412) 355-6500

*Counsel for Defendant*
*Three Rivers Health Plans, Inc.*

August 17, 2001

## **CERTIFICATE OF SERVICE**

I certify that on this 17th day of August, 2001, I served a true and correct copy of

the foregoing document by Telecopier and first class mail, upon the following person:

William E. Haggerty, Esq.
240 North Duke Street
Lancaster, PA  17602

David R. Fine

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Victor R. Cotton,

        **Plaintiff**

        v.

Three Rivers Health Plans, Inc.
and Warren Carmichael

        **Defendants**

:
:
:
:
:
:
:
:
:
:
:

NO. 1:CV-00-1709

## RESPONSE OF PLAINTIFF COTTON TO DEFENDANT'S INTERROGATORIES (SET NO. 1)

### GENERAL OBJECTION

    The number of interrogatories posed, including subparts, exceeds the number allowed by the Federal Rules of Civil Procedure, the local rules of court and the joint case management plan. Although Dr. Cotton will attempt to respond to all interrogatories that are not otherwise objectionable, in doing so it does not waive the right to assert this general objection. Subject to that general objection, without waiving it, Dr. Cotton does not concede his responses to any interrogatory as exhaustive.

### GENERAL RESERVATION OF RIGHTS

    Dr. Cotton reserves the right to supplement any of the following responses in accordance with Fed. R. Civ. P. 26(e). In addition, although Dr. Cotton will attempt to respond to all interrogatories that are not otherwise objectionable, Dr. Cotton specifically reserves the right to supplement any contention interrogatories at the conclusion of discovery. See Fed. R. Civ. P 33(c).

**1.    Describe in detail each and every fact known to you to support the factual assertions in Paragraphs 40-88 of the complaint, including, but not limited to, any facts that support the assertion that Jill Guffy made improper patient-care decisions or that she made patient-care decisions in an impaired state.**

ANSWER:    Objection. These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure. This interrogatory is overbroad and unduly

burdensome. Subject to these objection[...], see the Complaint, which will



EXHIBIT

"G"

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections, without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has received requested documents from Defendant and answers to Plaintiff's interrogatories to Defendants.  Also subject to these objections, without waiving them, the facts stated in the complaint are supported by the following and Plaintiff does not concede the following response as exhaustive:

After interviewing Guffy, reviewing her work history, and speaking with her by telephone, Plaintiff determined that she did not have the requisite skills set to perform the job of pharmacy director.  In particular, she was a poor communicator, had no managed care related experience, could not fully grasp the primary purpose of the Pharmacy Director position, and was more concerned about securing two extra weeks of vacation per year than she was about her actual job duties.  Plaintiff twice voiced these concerns to Carmichael, but Carmicheal hired Guffy for the position.

In early November, Guffy began missing multiple days of work and, upon Plaintiff's inquiry, could not give a clear indication of what was wrong with her nor when she might be back at work.  Over the course of several communications she told Plaintiff that she was taking Neurontin and either Percocet or Darvocet.  She sent several Emails to her staff and to Plaintiff in which she communicated patient related information along with lengthy descriptions of how these drugs were making her "float" and "hallucinate."  At that time, which was on or about November 4, Plaintiff instructed her that she was to not be involved with medical decision making until she was off of these drugs.  Plaintiff communicated to her staff member, Sherri Williams, that all patient related decisions must be brought to Plaintiff, and not to Guffy.  Plaintiff also told Guffy that she could not return to work until she was off of the drugs.

On or about November 10, Guffy returned to work and indicated that she was capable of working.  Within several days, it became apparent that in Plaintiff's judgment as a physician who has years of experience in dealing with substance abuse issues that her judgment was impaired and that she was still using some type of medication.  Specific examples of her impaired judgment and the compromises of member care related thereto are contained in the documentation that Plaintiff kept, and regularly forwarded to Carmichael and to Ludlum.  Because the issue involved the possibility of an Americans with Disabilities Act issue, and because Plaintiff was unaware of any TRHP policy that related to such a matter, Plaintiff sought the advice of Carmichael and Ludlum in an effort to protect the lives of the membership without exposing TRHP to liability related to Guffy's employment and/or the ADA.

In the following weeks, Plaintiff learned that Guffy was still taking Neurontin while at work and had offered Percocet or Darvocet to Anna Paglia. Plaintiff was unable to watch Guffy every minute of every day and was greatly concerned about the decisions that she was making in Plaintiff's absence. Patricia Casey, Amy Sandy, Debra Cerutti, Michelle Jones, April Cotton and Kelly Lennon all complained to Plaintiff that Guffy was "on something" and that her performance was impaired.

Guffy's failure to follow through with PCS on the paperwork related to a change in the pharmaceutical benefit package left nearly one half of TRHP's membership without any prescription coverage for approximately 2-3 days. After this debacle, which occurred in early January, Carmichael commented to Plaintiff that Guffy was "not all there."

Guffy's failure to follow through with the Department on a change in coverage for Prilosec delayed a program that would have eliminated harmful use of that drug and saved TRHP thousands of dollars.

In response to Plaintiff's repeated requests for action on this matter, Carmichael heavily criticized Plaintiff and relayed negative thoughts about Plaintiff's conduct to at least Ludlum and Lawson.

Guffy served in an unrestricted manner as pharmacy director - a role that includes many patient care related decisions every day - for more than 6 weeks in a condition that was, in Plaintiff's medical opinion, badly drug impaired. To Plaintiff's knowledge, neither Carmichael, Ludlum, Lawson, nor Thomas had any training in the recognition and management of a drug impaired condition and none of them had nearly the amount of direct contact that Plaintiff had with Guffy. Despite this, Plaintiff's multiple written and verbal expressions of concern for the lives of 75,000 members were eventually characterized as "a personal issue", "a management style problem", and as "being too hard on Guffy."

Plaintiff's concerns over Guffy's drug impaired state is also reflected in a letter from Guffy to Plaintiff, dated December 10, 1998, a copy of which was forwarded to Carmichael and placed in Guffy's employment file.

**2.     Describe in detail each and every fact known to you that supports the factual assertions in Paragraphs 99-119 of the complaint, including, but not limited to, any facts that would in any way suggest that the actions attributed to Ms. Casey and Defendants in those paragraphs in any way affected the quality of patient care.**

ANSWER:    Objection. These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure. This interrogatory is overbroad and unduly

burdensome. Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference. Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

According to the HCSW program guidelines and the applicable TRHP policies, the UM department was required to report to a licensed physician. Carmichael's actions supplanted Plaintiff in this role and, in doing so, compromised the quality of the healthcare by removing the judgment of a licensed physician from the operation and organization of the department.

In addition, all patient care decision were required by the HCSW program to be made by licensed medical professionals. There was no place for a non medical person to play any role. The decision by an accountant (Carmichael) that he was going to supplant Plaintiff, and play a bigger role in patient care decisions, is a compromise of the quality of patient care. An accountant is not qualified to make a patient care decision.

Carmichael's improper handling of the Casey matter, and improper behavior in general, led to the resignations of multiple key members of the nursing staff, including Sandy, Cerutti and Shields. The resignation of these persons depleted the UM department of much of its management, talent and experience, all of which compromised the quality of healthcare delivered to the membership.

**3.      Describe in detail each and every fact known to you that supports the factual assertions in Paragraph 128 of the complaint, including, but not limited to, any facts that would support the assertions that Mr. Carmichael's actions, decisions or directives "amounted to compromises of patient care and violations of the Medical Assistance Program integrity," and that "TRHP was not allowing TRHP's central obligation to be met."**

ANSWER:    Objection. These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure. This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

The central purpose of HCSW program is to have the affected Medical Assistance recipients
move from unmanaged healthcare into managed healthcare.  By participating in the HCSW
program, TRHP is contractually bound to fulfill this purpose.  According to the HCSW
requirements, this healthcare is to be managed by medical professionals.  The HCSW program
mandates multiple requirements in this regard.  These include but are not necessarily limited to:
Only physicians and nurses can make medical necessity determinations, the UM department is to
report to a licensed physician, a pediatrician must be consulted for certain cases involving a
decision on a child, and certain disputes over coverage must be resolved by an impartial appeals
committee composed entirely of physicians from the community.  HCSW is clear that care is to
be managed in a high quality manner by medical professionals.  Carmichael's behavior
demonstrated repeated violations of this purpose.

On or about May 3, 1999, Carmichael made a medical necessity determination on James
Grantham that overrode the decision made by Plaintiff, Dr. Richards, Dr. Wyszomerski , Donna
Lengle, Debra Cerutti, and Grantham's primary care physician.  This decision was made without
any input from any medical professional and fulfilled Carmichael's threat that he was going to
make patient care decisions.  Having an accountant override the decision of medical
professionals and make medical necessity determinations was a complete violation of the HCSW
program.

Carmichael supplanted Plaintiff as supervisor of the UM department and repeatedly reorganized
the department, reassigning duties and reporting structure without knowledge of the duties being
performed nor the impact on patient care of these decisions.  On May 11, in retaliation against
Plaintiff and Lengle, Carmichael eliminated the position of UM Director at TRHP.  The impact
of this decision is detailed in the complaint beginning at paragraph 180.  As a summary,
Carmichael's decision to endanger the lives of TRHP's members so that when one of them died,
the matter could be used to "scapegoat" Plaintiff, was a complete disregard of TRHP's
obligation to deliver properly managed healthcare.

**4.    Describe in detail each and every fact known to you that supports the factual assertions in Paragraph 131 of the complaint, including, but not limited to, the name of the patient described, the nature of the service described, the nature of Plaintiff's "medical decision" and the nature of Mr. Carmichael's alleged action with regard to that patient and Plaintiff's decision.**

ANSWER:    Objection.  These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure.  This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

The patient was James Grantham.  The patient was a child who was chronically ill, but had no acute medical problems nor need for skilled nursing services.  The patient lived at home with his mother.  The patient was cared for by several physicians and his care was somewhat disjointed, with multiple conflicting physician orders as to his care.  After Plaintiff discussed the case with Debra Cerutti, his physician at UPMC, his PCP, Dr. Richards, and Dr. Wyszomerski, the group decided that it would be in the best interest of the child if his PCP coordinated his care.  Debra Cerutti began working with the PCP and the two came up with a plan to reduce the intensity of nursing visits from continuous 16 hour a day shift nursing to about 12 hours a day.  The purpose was to allow the re-establishment of the proper mother-child relationship, which had been significantly disrupted over the preceding months of hospitalization.  Dr. Wyszomerski and Dr. Richards agreed with Plaintiff on this decision.

Unfortunately, the mother disagreed with this decision and was politically successful in gaining the interest of the Department on her behalf.  Without asking for any input on the matter, nor attempting to resolve the issue in conjunction with the medical staff, Carmichael deemed Plaintiff to be a "failure as a physician", and immediately called a meeting with Lengle, Plaintiff, Richards, Cerutti, Thomas, and perhaps Casey and Sandy present.  Without any discussion,

6

Carmichael immediately stated that he was overriding Plaintiff's decision and that he was making a medical decision to provide for 16 hours of nursing coverage.

**5.    Describe in detail each and every fact known to you that supports the factual assertions in Paragraphs 132-133 of the complaint, including but not limited to, any facts that support the allegation that Defendants in any way violated Pennsylvania's Medical Assistance Program regulations and guidelines or the Medical Practices Act of 1985.**

ANSWER:    Objection.  These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure.  This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

The violations of the Medical Assistance Program guidelines are detailed in the complaint and in answers previously given.  The Medical Practice Act of 1985 provides that only licensed physicians may engage in the practice of medicine.  Carmichael's assumption of medical necessity decision making constituted violation of the Act in that he was engaging in an act that was by law required to be performed by a licensed physician.

**6.    Describe in detail each and every fact known to you that supports the factual assertions in Paragraphs 135 and 138 of the complaint, including, but not limited to, the names of the members of the staff who engaged in "open discussions of the potential medical and legal consequences" described in Paragraph 135, the contents of those discussions, the names of the attorneys consulted by those persons and any actions taken by those persons or their attorneys with regard to the allegations of the complaint.**

ANSWER:     Objection.  These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure.  This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

Donna Lengle, Amy Sandy, Debra Cerutti, Lori Shields, Sonya Asay and Terry Quinn.  The
discussions included Carmichael's medical decision making, violation of the HCSW program
requirements with respect to the organization and operation of the UM department, Carmichael's
retaliation against those who spoke up in disagreement of him, Carmichael and Casey's creation
of a hostile work environment, Carmichael's refusal to respond to requests for change, and
Thomas' refusal to properly perform his duties as compliance officer in investigating the
complaints that were brought to his attention regarding the above matters.

7.     **Describe in detail each and every fact known to you that supports the factual
assertions in Paragraph 145 of the complaint, including, but not limited to, the names of any
"persons who complained to the compliance officer," the acts Plaintiff alleges constitute
"open retaliat[ion]" and the names of any TRHP employee in any way involved in the
alleged retaliation.**

ANSWER:     Objection.  These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure.  This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

Donna Lengle, Amy Sandy, Debra Cerutti and Lori Shields complained that Carmichael's behavior with respect to Pat Casey and the UM Department was unfair, created a hostile work environment, and compromised the ability of the UM Department to perform its function. In response, Carmichael reassigned Cerutti and Shields so that they reported directly to Casey (about whom they had complained), repeatedly made reference in meetings with the UM Department to Sandy's alleged shortcomings as a manager (in contrast to Carmichael's repeated praise of Sandy in the past), and eliminated the position of UM director so that Lengle had no foreseeable chance of promotion.

Plaintiff's complaints to the compliance officer about the need for an impaired medical professional policy and about the physical attack by Casey were never properly addressed and ultimately served as the basis for retaliation by Carmichael for Plaintiff's alleged act of going over Carmichael's head and not properly communicating.

**8.    Describe in detail each and every fact known to you that supports the factual assertions in paragraph 150 of the complaint, including, but not limited to, the name of the former employer, the nature of Plaintiff's involvement as an "informant" and the results of any legal action or investigation.**

ANSWER:    Objection.  These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure.  This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

From 1992-1995, Plaintiff was medical director in a medical practice owned by Polyclinic Hospital in Harrisburg, PA. Nelson Gantz, MD, who was a member of the hospital administration, also practiced part-time in the practice. Gantz engaged in a systematic pattern of "upcoding" while at the practice and regularly failed to follow Medicare guidelines for supervision of residents and nurse practitioners. In his role as medical director of the practice, Plaintiff raised his concerns to Gantz and then to Gantz' superior, Dr. Florence. Plaintiff's concerns were rebuffed. On or about January 1996, Plaintiff took his complaint to the FBI and met with special agents concerning the matter. Plaintiff does not know the ultimate disposition of the matter. Plaintiff's identity and role in the matter are sealed by authorities.

**9.      Describe in detail each and every discussion between Plaintiff and any employee or officer of TRHP in which Plaintiff made any suggestion that he might contact state or federal authorities, initiate any state or federal investigation, participate in any state or federal investigation or in any other way have contact with any governmental authority regarding the allegations in the complaint. Your response should include, but not be limited to, the dates of the discussions, the participants or observers of any such discussions and the precise statements made during any such discussions.**

ANSWER:      Objection. These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure. This interrogatory is overbroad and unduly

burdensome. Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference. Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

On May 12, 1999, Plaintiff had a discussion with Carmichael in Plaintiff's office. There were

no other persons present. The door was closed. As detailed in the Complaint, the topic of

discussion was the Memo of May 11, and the program compromises. When Carmichael refused to honor his promises of the preceding day, Plaintiff gradually introduced the threat of government action by reminding Carmichael that his actions violated various program requirements and compromised TRHP's promise to the government. Carmichael responded with derogatory remarks and profanity, the exact wording of which is difficult to recall with precision by Plaintiff. At that juncture, over the ensuing several minutes, Plaintiff stated that this is not an issue between Carmichael and Plaintiff, these are federal dollars and a federal program that Carmichael is violating, that Plaintiff knew the truth and was going to use it by going to the government, that Carmichael's behavior reduced the HealthChoices program to a sham and would be viewed by the government as fraud.

On or about May 20, 1999, Plaintiff met with Lawson in Plaintiff's office. Plaintiff expressed to Lawson his concern that TRHP needed to abide by its promises to the government, and that [Carmichael's] behavior was violating the central purpose of that obligation. Lawson dismissed Plaintiff's concerns by stating that Plaintiff didn't know what he was talking about, that they (the government) do not expect TRHP to honor every requirement in the HCSW program, that it states that we are to have a CFO, but we have a Controller instead, and that is fine.

**10.    Describe in detail each and every fact known to you that supports the factual assertions in Paragraphs 206-218 of the complaint, including, but not limited to, a complete description of each and every alleged disenrollment of a transplant candidate. Your response should include, but not be limited to, the names of the patients, the dates on which they became transplant candidates, the dates on which they were disenrolled, the TRHP involved in the disenrollment (including any employee directing the actions of any other employee) and any facts of which you are aware that would support the conclusion that the disenrollment was a result of the patients' being placed on a transplant list.**

ANSWER:    Objection. These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure. This interrogatory is overbroad and unduly

burdensome. Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference. Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

During the time in question, Plaintiff witnessed the disenrollment of approximately 12 transplant candidates. The disenrollments were performed by Adams under the direction of Carmichael. On several occasions, when Plaintiff would alert Carmichael to the possibility of a transplant expenditure, Carmichael would make reference to the fact that that member is going to be disenrolled. A short time later, Adams would appear with a signed disenrollment form and receive hearty congratulations from Carmichael. At one juncture, Carmichael even stated that [Adams] should be part of the medical cost containment team for her work with the transplant candidates.

**11.    Describe in detail any way in which you contend that the federal government was defrauded in any way as a result of the actions or inactions alleged in your complaint. Your response should include, but not be limited to, identification of any documents that facilitated or played any part in the alleged fraud, identification of the federal agency allegedly defrauded and description of any pecuniary harm you allege was caused to the government by the alleged fraud.**

ANSWER:    Objection. These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure. . This interrogatory is overbroad and unduly

burdensome. Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference. Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants. Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

The medical assistance program is a federal program that receives the majority of its funding from the federal government. Although administered by the Commonwealth, the law is clear that with respect to fraud against the medical assistance program, such acts are considered to be fraud against the federal government. The Department's contract provisions with TRHP

12

prevented any type of "medical credentialling" with respect to the enrollment or disenrollment of members. The complaint and the answers above contain facts supporting that the federal government was defrauded out of hundreds of thousands, if not millions of dollars with respect to the systematic disenrollment of transplant candidates. TRHP accepted the insurance risk for these members, then improperly sent them back to DPW when one of these members faced an extraordinary event like a transplant. TRHP agreed to accept the insurance risk of any member that it enrolled, and it defrauded the federal government when it systematically disenrolled transplant candidates.

As detailed in the preceding answers and the complaint, the central purpose of HCSW program is to have the affected Medical Assistance recipients move from unmanaged healthcare into managed healthcare. By participating in the HCSW program, TRHP is contractually bound to fulfill this purpose. According to the HCSW requirements, this healthcare is to be managed by medical professionals. The HCSW program mandates multiple requirements in this regard. These include but are not necessarily limited to: Only physicians and nurses can make medical necessity determinations, the UM department is to report to a licensed physician, a pediatrician must be consulted for certain cases involving a decision on a child, and certain disputes over coverage must be resolved by an impartial appeals committee composed entirely of physicians from the community. HCSW is clear that care is to be managed in a high quality manner by medical professionals. Carmichael's (an accountant) behavior demonstrated repeated violations of this purpose.

On or about May 3, 1999, Carmichael made a medical necessity determination on James Grantham that overrode the decision made by Plaintiff, Dr. Richards, Dr. Wyszomerski, Donna Lengle, Debra Cerutti, and Grantham's primary care physician. This decision was made without any input from any medical professional and fulfilled Carmichael's threat that he was going to make patient care decisions. Having an accountant override the decision of medical professionals and make medical necessity determinations was a complete violation of the HCSW program.

Carmichael supplanted Plaintiff as supervisor of the UM department and repeatedly reorganized the department, reassigning duties and reporting structure without knowledge of the duties being performed nor the impact on patient care of these decisions. On May 11, in retaliation against Plaintiff and Lengle, Carmichael eliminated the position of UM Director at TRHP. The impact of this decision is detailed in the complaint beginning at paragraph 180. As a summary, Carmichael's decision to endanger the lives of TRHP's members so that when one of them died that the matter could be used to "scapegoat" Plaintiff, was a compete disregard of TRHP's obligation to deliver properly managed healthcare.

In previous whistle blower actions, the government has made clear that failure to fulfill a central purpose of a government contract will be viewed as fraud. Here, TRHP accepted federal dollars in return for a promise to deliver high quality managed care. Carmichael's behavior reduced this

promise to a sham and in doing so defrauded the government out of every dollar that TRHP took in.

**12.    Describe each and every way in which you contend (as noted in Paragraphs 202 and 204 of the complaint) that Defendants' actions "intentionally violated multiple program requirements" or that Defendants' actions "Constituted the unauthorized practice of medicine under Department of Health regulations, and the Medical Practice Act."**

ANSWER:    Objection.  These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure.  This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants.

**13.    Describe each and every fact and identify each and every document that you contend supports the claim in the complaint that Plaintiff had a contractual relationship with either of the Defendants.  Your response should include, but not be limited to, any facts within your knowledge regarding the intention of the parties to form a contract and the intended duration of the contract.**

ANSWER:    Objection.  These interrogatories, including subparts, exceed the number allowed

by the Federal Rules of Civil Procedure.  This interrogatory is overbroad and unduly

burdensome.  Subject to these objections, without waiving them, see the Complaint, which will

to answer this interrogatory, and is incorporated by reference.  Also subject to these objections,

without waiving them, Plaintiff will reasonably supplement these answers when Plaintiff has

received requested documents from Defendant and answers to Plaintiff's interrogatories to

Defendants.  Also subject to these objections, without waiving them, the facts stated in the

complaint are supported by the following and Plaintiff does not concede the following response

as exhaustive:

The answer includes those facts already in the complaint, including paragraphs 248 - 309.  The
contract was primarily negotiated on behalf of TRHP by Lawson, and the intention to make
Plaintiff a more permanent member of TRHP was echoed by Carmichael.  Lawson asked
Plaintiff for a five year commitment, but because Plaintiff has young children and was not
certain if or when my wife might be able to move her career, Plaintiff was clear that Plaintiff
could commit to only three years.  After discussion as to how the parties might structure the
arrangement, Plaintiff agreed to forego present compensation for the opportunity for a larger
payout in the future.

Recognizing that Plaintiff needed a certainty of payment for services rendered, Plaintiff asked
for promise of guaranteed payment at the end of the three years.  Accordingly, the percentage of
profits agreement was added to the agreement.  Elements of these negotiations were
memorialized in several memos from Lawson date September 14, 1998 and September 29, 1998,
and from Carmichael dated December 1, 1998.  The memos show that as part of the bargained
for exchange, Plaintiff's medical cost containment incentive plan of November 11, 1997 (that
was paying out about $80,000 per year) would be eliminated and that Plaintiff's portion of
general corporate profit sharing would be capped at $25,000 per year.  The agreement contained
significant consideration on Plaintiff's part wherein Plaintiff agreed that beginning September
30, 1998, Plaintiff would forego approximately one-third of his present income in return for the
promise of a payout at the end of 3 years.  The final document granting the option and
percentage of profits interest underwent several language revisions and was eventually signed in
early May, 1999.  Defendant is in possession of originals or copies of any and all documents that
Plaintiff may have which would aid in answering this interrogatory.


**14.      Describe in detail and quantify the damages Plaintiff seeks in this action and identify
the count in the complaint that you allege gives rise to each item of damages.**

ANSWER:  Plaintiffs damages are continuing and ongoing, and Plaintiff reserves the right to

modify, amend or otherwise supplement the answer to this interrogatory.


Count 1- Breach of Contract:

24 months pay at ($175,000 per year) =                                  $350,000

3% of projected after tax profit for 3 years (3% times $18,000,000)  $540,000
Loss of money on sale of Monroeville Home                     $20,000
Loss of retirement and other benefits                 $30,000
Total   $940,000

Count 2-Wrongful Termination:  See damages for Count 1 plus unliguidated damages as
determined at trial in this matter.

Count 3- Punitive Damages for Count 2.  See Counts 1 and 2 plus punitive damages as
determined at the trial in this matter.

Count 4 - Whistle Blower Violation:

24 months pay times 2 = $700,000
Plus attorneys fees
Loss of retirement and other benefits = $30,000
Plus reinstatement of position, or severance package of 3% of $18,000,000 plus 12 months pay =
$715,000

Total = $1,445,000 plus attorneys fees

15.    Identify each witness Plaintiff will call at the trial of this case or use to support any
motion in this case (including both fact and expert witness).

Answer:     Plaintiff will call Dr. Victor Cotton.  Plaintiff has not yet determined what other
witnesses he will call at trial of this case.  Upon such determination, Plaintiff will supplement
this response in accordance with the Federal Rules of Civil Procedure.


                                                        LEHMAN & LEHMAN
                                                        ATTORNEYS AT LAW

DATE: _May 9, 01_                                       BY: _____
                                                        DOUGLAS P. LEHMAN, ESQUIRE
                                                        Attorney I.D. No. 68887
                                                        230 North Duke Street
                                                        Lancaster, PA  17602
                                                        717-392-3711

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on _May 9_, 2001, I served a true and correct copy of the forgoing on the following by fax and then by first class United States Mail, overnight delivery, postage-prepaid.

KIRKPATRICK and LOCKHART, LLP
Mr. Mark A Rush, Esquire
Mr. David R. Fine, Esquire
240 North Third Street
Harrisburg, PA 17101
Attorneys for Defendants

LEHMAN & LEHMAN
ATTORNEYS AT LAW

BY: _____
DOUGLAS P. LEHMAN, ESQUIRE
Attorney I.D. No. 68887
230 North Duke Street
Lancaster, PA 17602
Telephone: 717/392-3711
Attorneys for Plaintiffs



Payne Shoemaker Building
240 North Third Street
Harrisburg, PA 17101-1507
717.231.4500
Fax: 717.231.4501

# FAX

| | | | |
|---|---|---|---|
| **Date:** | December 28, 2001 | **Number of Pages, including coversheet:** | **5** |

**Transmit To:**

| | | | |
|---|---|---|---|
| Name | William E. Haggerty, Esq. | Phone | (717) 397-3200 |
| Firm | Haggerty Law Firm | Fax | (717) 397-3724 |

**From:**

| | | | |
|---|---|---|---|
| Attorney | David R. Fine | Phone | (717) 231-5820 |
| Secretary | Virginia Hoover | Phone | (717) 231-5981 |

| Client Name | Client Matter | Client Number |
|---|---|---|
| Three Rivers Health Plan | Victor Cotton | 0220565.501 |

**COMMENTS:**

When you are sending to us, please be sure to include a cover sheet with your transmittal and a telephone number where you can be contacted in case of equipment malfunction.

**Transmitted by:**                    **Time:**

**IMPORTANT:** The materials transmitted by this facsimile are sent by an attorney or his/her agent, and are considered confidential and are intended only for the use of the individual or entity named. If the addressee is a client, these materials may also be subject to applicable privileges. If the recipient of these materials is not the addressee, or the employee or agent responsible for the delivery of these materials to the addressee, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us at 717.231.4500 (collect) and return the transmitted materials to us at the above address via the U.S. Postal Service. We will reimburse you any costs incurred in connection with this erroneous transmis........ .....erials. Thank you. **Please report problems with reception by calling 717.231.4500.**

**EXHIBIT**

"H"

# Kirkpatrick & Lockhart LLP

Payne Shoemaker Building
240 North Third Street
Harrisburg, PA 17101-1507
717.231.4500
www.kl.com

December 28, 2001

David R. Fine
717.231.5820
Fax: 717.231.4501
dfine@kl.com

**BY TELECOPIER AND U.S. MAIL**

William E. Haggerty, Esq.
240 North Duke Street
Lancaster, PA 17602

      Re:   *Cotton v. Three Rivers Health Plans, Inc.*, No. 1:CV-00-1709,
             U.S. District Court for the Middle District of Pennsylvania

Dear Bill:

        This responds to your letter faxed to my office yesterday afternoon regarding certain pretrial matters and certain discovery matters.

        While we will review that letter in more detail and provide a more comprehensive response, there are a couple of points we should probably clarify sooner rather than later.

        First, Dr. Cotton's list of potential trial witnesses includes several persons who were not disclosed during the discovery period (*e.g.*, Joy Cotton, Anthony Horbal, Mary Mihalyo, James Hancovsky, Diane Laurent, Denise Romero, Brenda Kehler, Keith Cameron, Tom Clark, Gary Weinstein, Robert Mount Joy, Jack Laeng, Saniel Sacco, Wilford Payne, Matt Liberty, Douglas Lehman, a representative of the FBI, a representative of the Pennsylvania Office of Attorney General and a representative of the Pennsylvania Department of Public Welfare). The list also includes persons who were not timely disclosed (*e.g.*, Kelly Lennon and Amy Sandy). Finally, the list includes employees of Three Rivers with no apparent connection to this case. Please be advised that Three Rivers will strongly object to Dr. Cotton's attempt to introduce these proposed witnesses.

        Second, your letter refers to certain discovery matters and attaches letters to which you allege you received no reply. In fact, I responded to your August 7, 2001, letter the next day. A copy of my letter is enclosed. That letter remains accurate. Moreover, we think it inappropriate for Dr. Cotton to be raising a discovery issue four months after the close of discovery and more than a month after the completion of briefing on a dispositive motion.

**Kirkpatrick & Lockhart** LLP

William E. Haggerty, Esq.
December 28, 2001
Page 2

We will review the other matters in your letter and respond as quickly as possible.

Very truly yours,

David R. Fine

cc : David W. Thomas, Esq.
Mark A. Rush, Esq.

# Kirkpatrick & Lockhart LLP

Payne Shoemaker Building
240 North Third Street
Harrisburg, PA 17101-1507
717.231.4500
www.kl.com

David R. Fine
717.231.5820
Fax: 717.231.4501
dfine@kl.com

August 8, 2001

**BY TELECOPIER ONLY**

William E. Haggerty, Esq.
240 North Duke Street
Lancaster, PA 17602

      Re:    *Cotton v. Three Rivers Health Plans, Inc.*, No. 1:CV-00-1709 in the U.S.
             District Court for the Middle District of Pennsylvania

Dear Mr. Haggerty:

This letter responds to the letter you faxed to me yesterday afternoon regarding document production.

Your letter is confusing in that, in some places, it seeks documents never requested and, in others, it seeks documents for which valid objections were offered. Perhaps it would be best to address your inquiries paragraph-by-paragraph:

1.    **Personnel files for Ms. Mandela, Ms. Casey, Ms. Wetzel and Ms. Guffey.** We have reviewed Dr. Cotton's requests for production and do not see where these files were requested. Moreover, even if they had been requested, the request would be objectionable in that those are personnel files that are confidential. Finally, the files are irrelevant to any claim or defense in the case.

2.    **All files which relate to Dr. Cotton.** Dr. Cotton did not request "all files" regarding himself. He requested documents regarding his profit-sharing distribution (Request No. 7), reports made to the compliance officer about Dr. Cotton (Request No. 29), correspondence relating to Dr. Cotton's performance, abilities and termination (Request No. 28), Mr. Hogenmiller's report regarding the situation involving Dr. Cotton and Ms. Mandella (Request No. 30) and the file relating to the investigation of Dr. Cotton's allegation against Ms. Casey (Request No. 32). Three Rivers offered appropriate objections to these requests but, in most cases, produced responsive documents. Your letter does not in any sense challenge the propriety of those objections.

3.    **Hospital contracts and all communication with regard to these contracts, renegotiations and issues or problems arising out of the relationship between these hospitals and Three Rivers.** This presumably refers to Dr. Cotton's Request Nos. 10 and 12. Three Rivers offered appropriate objections to those requests and your letter does not in any sense challenge the propriety of those objections.

EXHIBIT
I

**Kirkpatrick & Lockhart LLP**

William E. Haggerty, Esq.
August 8, 2001
Page 2

4.    **Provider contracts.** Again, we understand this to refer to Dr. Cotton's Request Nos. 10 and 12. As noted, Three Rivers objected to these and your letter does not challenge those objections.

5.    **Files with regard to the investigation conducted by Mr. Hogenmiller.** Three Rivers produced all documents related to that investigation other than those that are privileged. Your letter does not challenge the propriety of that privilege objection.

6.    **DPW records.** Having reviewed again the joint case-management plan, Three Rivers will produce responsive and otherwise non-privileged documents. In doing so, it does not waive any objection to their relevance.

7.    **All documents criticizing Dr. Cotton and his performance as a Medical Director for Three Rivers.** In response to Dr. Cotton's Request No. 28, Three Rivers offered an objection but also produced a number of documents. Your letter does not challenge the propriety of the objection.

8.    **All job descriptions for Dr. Cotton's role as Medical Director, whether such description was produced internally by Three Rivers or by an outside entity.** We do not see that Dr. Cotton ever requested such job descriptions. Nonetheless, Three Rivers has already produced the job description it prepared for the medical director position. It is not in possession, custody or control of any other entity's job description.

In summary, Three Rivers has produced literally hundreds of pages of documents and, where appropriate, has offered objections to Dr. Cotton's requests. Three Rivers continues to believe that those objections were warranted and your letter does not offer any reason to question that conclusion.

Very truly yours,

David R. Fine

cc:    David W. Thomas, Esq.
       Mark A. Rush, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JUN - 1 2001

|  |  |  |
|---|---|---|
| VICTOR R. COTTON, | : | CIVIL ACTION NO. |
| Plaintiff | : | 1:CV-00-1709 |
|  | : |  |
| v. | : | Judge Kane |
|  | : |  |
| THREE RIVERS HEALTH PLANS, INC., | : |  |
| a Corporation, and WARREN | : |  |
| CARMICHAEL, | : |  |
| Defendant | : |  |

**FILED**
HARRISBURG, PA

MAY 3 1 2001

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

**O R D E R**

**AND NOW** this 31st day of May, 2001, **IT IS HEREBY ORDERED**

**THAT** plaintiff's motion to extend discovery is **GRANTED**.  Discovery shall be enlarged

until August 17, 2001.  All other deadlines set forth in this court's March 6, 2001 case

management order remain in effect.


Yvette Kane
United States District Judge

**EXHIBIT**
J