

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VICTOR R. COTTON,  :
        Plaintiff  :  Civil Action No. 1:CV-00-1709
           :
v.  :  Judge Kane
           :
THREE RIVERS HEALTH PLANS, INC.,  :
a Corporation, and WARREN  :
CARMICHAEL,  :
        Defendants  :

**FILED FEB 2 1 2002 PER ___ HARRISBURG, PA DEPUTY**

### PLAINTIFF'S TRIAL BRIEF

**I.      STATEMENT OF PROCEDURAL HISTORY AND FACTS**

Plaintiff, Victor R. Cotton, began this action by filing a Complaint in the Court of Common Pleas of Dauphin County, Pennsylvania, on September 12, 2000. By notice of September 25, 2000, Defendants removed the case to this Court because of the federal question asserted in Counts 4 and 5 of the Complaint.

On October 12, 2001, Defendant filed a Motion for Summary Judgment which was subsequently granted in part and denied in part. This Court allowed Plaintiff's claim for wrongful discharge pursuant to Pennsylvania's Medical Gag Clause Prohibition, 40 P.S. section 991.2113(c), and claim for punitive damages to proceed.

Three Rivers Health Plans, Inc. ("TRHP"), is a Pennsylvania-licensed health maintenance organization. Dr. Cotton was hired by Defendant in September of 1997. Dr. Cotton was promoted to Senior Medical Director in January of 1998. In September of 1998, Dr. Cotton and Defendant agreed to a long-term relationship of a term of three (3) years. Plaintiff gave up approximately thirty three percent of his then current income in return for Defendant's promises of a greater return to accrue over the next three (3) years in the form of ownership of TRHP

Through the course of his work, Dr. Cotton became aware that Defendant was violating patient care by allowing a drug impaired pharmacist (Guffy) to make life sustaining patient

decisions; allowing Carmichael (an accountant) to make patient care decisions and intentionally understaff necessary for the proper delivery of health care, and improperly disenrolling organ transplant recipient candidates. Defendant was aware of Dr. Cotton's objections to these activities and the possibility that Plaintiff would take the information to the authorities. Plaintiff's employment was terminated on May 26 1999.

## II.  LAW

### A.  Wrongful Discharge

In general, Pennsylvania does not recognize a common-law cause of action for the termination of an at-will employee. Paul v. Lankenau Hosp., 569 A.2d 346 (Pa. 1990). An at-will employee may be fired for good reason, bad reason, or no reason at all. Krajsa v. Keypunch, Inc., 622 A.2d 355 (Pa. Super. 1993). Exceptions to this rule have been recognized in only the most limited of circumstances, where discharge of at-will employees would threaten clear mandates of public policy. Clay v. Advanced Computer Applications, Inc., 559 A.2d 917 (Pa. 1989).

In order to state a cause of action for wrongful discharge based upon the public policy exception to the at-will employment doctrine, the employee must identify "a clear public policy articulated in the constitution, legislation, an administrative regulation, or a judicial decision." Hunger v. Grant Cent. Sanitation, 670 A.2d 173, 175 (Pa. Super. 1996). A cause of action for wrongful termination of an at-will employment relationship can be sustained only "in the most limited of circumstances where the termination implicates a clear mandate of public policy." McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283, 287 (Pa. 2000).

The public policy at issue should be the type which "strikes at the heart of the citizen's social rights, duties and responsibilities." McGonagle v. Union Fidelity Corp., 556 A.2d 878 (Pa. Super. 1989), *allocatur denied*, 575 A.2d 115 (Pa. 1990). Absent legislation, the judiciary

2

must define the cause of action in case-by-case determinations. Reitz v. Persing, 831 F. Supp. 410 (M.D. Pa. 1993).

The public policy exception is generally broken down into three categories: an employer cannot (1) require an employee to commit a crime; (2) prevent an employee from complying with a statutorily imposed duty; or (3) discharge an employee when a statute specifically prohibits it from doing so. Spierling v. First American Home Health Servs., Inc., 737 A.2d 1250 (Pa. Super. 1999).

In Hennessy v. Santiago, 708 A.2d 1269 (Pa. Super. 1998), the court held that an employer cannot terminate an "at-will" employee where "[the employer] is specifically prohibited from doing so by statute." Id. at 1273.

Since Dr. Cotton is a licensed physician and Defendant is a managed care organization, the applicable statute that specifically prohibits Defendant from terminating Dr. Cotton is Pennsylvania's "medical gag clause prohibition", 40 P.S. 991.2113(c), which states that:

> "No managed care plan shall terminate the employment of or contract with a healthcare provider for any of the following reasons: (1) advocating for medically necessary and appropriate health care consistent with the degree of learning and skill ordinarily possessed by a reputable health case provider practicing according to the applicable legal standard of care, reasonably…(3) protesting a decision, policy or practice that the health care provider, consistent with the degree of learning and skill ordinarily possessed by a reputable health care provider practicing according to the applicable legal standard of care, reasonably believes interferes with the health care provider's ability to provide medically necessary and appropriate care."

## III.  DISCUSSION

This "medical gag clause prohibition" language is very clear and unambiguous. Therefore, there is no need to examine the legislative history behind the statute. The "medical gag clause prohibition" is applicable to Dr. Cotton because he is a licensed physician.

Moreover, TRHP is a managed care organization pursuant to the definition of a "health care provider" in 40 P.S. 991.2111 which defines a "health care provider" as a "person who is

3

**licensed**, certified or otherwise regulated to provide health care services under the laws of this Commonwealth, including a **physician**...."

Dr. Cotton was "[a]dvocating for medically necessary and appropriate health care" and he was "[p]rotesting a decision, policy or practice" that he thought "interfere[d] with the health care provider's ability to provide medically necessary and appropriate health care." See 40 P.S. 991.2111(c). Through the course of his work, Dr. Cotton became aware that Defendant was violating patient care by allowing a drug impaired pharmacist (Guffy) to make life sustaining patient decisions, by allowing Carmichael (an accountant) to make patient care decisions and intentionally understaff necessary for the proper delivery of health care, and by improperly disenrolling organ transplant recipient candidates. Defendant was aware of Dr. Cotton's objections to these activities and the possibility that Plaintiff would take the information to the authorities. Accordingly, TRHP was prohibited from terminating Plaintiff for his actions according to 40 P.S. 991.2113(c).

TRHP did not have any legitimate, non-retaliatory reason for discharging Dr. Cotton. Rather, the alleged reasons set forth by TRHP were simply a pretext for retaliation for Dr. Cotton's attempts to protect patients by opening up an investigation of TRHP's wrongdoings regarding patients' care. Dr. Cotton met with the Attorney General in October of 2000 and the FBI in December of 2000 to discuss various improprieties, including Defendant's improper medical decision-making regarding the handling of the Guffey matter in which Defendant acted criminally.

Dr. Cotton has pointed to numerous weaknesses, implausibilities, inconsistencies, incoherencies and contradictions in Defendant's proferred legitimate reasons that makes those reasons unworthy. They include the fact that Dr. Cotton was promoted to Senior Medical Director in January of 1998. Moreover, within two weeks of the September 1, 1998 letter, which Defendant contends was inappropriate, Mr. Lawson and Dr. Cotton had tentatively agreed upon a

4

compensation plan that enhanced Cotton's stake in the company. Mr. Carmichael stated that "the Team has benefited greatly from [Dr. Cotton's] leadership and insight" in a note of January 20, 1998. On May 4, 1999, Dr. Cotton received for signature and signed the document extending him an interest in three percent of the company and its profits over the next three years. The percentage Dr. Cotton received was twice as large as any other executive received. Finally, Mr. Carmichael acknowledged that Dr. Cotton's "management of inpatient utilization extremely strong" and he has "fierce loyalty among his staff. They feel he is an excellent teacher, coach; really in their corner." Mr. Carmichael's statement of Dr. Cotton's ability to work effectively with his subordinates is supported by various statements of those subordinates.

Defendant's argument that Dr. Cotton was terminated for improper sexually related behavior is contradicted by Mr. Lawson's own testimony that he was "not asserting that we terminated Dr. Cotton because he committed---because he was guilty of sexual harassment."

Defendant's argument that Dr. Cotton was terminated for improper interaction with Uniontown Hospital is contradicted by the fact that Dr. Cotton's actions were authorized and approved by Mr. Carmichael. The circumstances were that in late 1997, Dr. Cotton became aware that Uniontown Hospital was improperly upcoding its invoices/claims for payment submitted to TRHP and that this upcoding had resulted in excess payments by TRHP to Uniontown Hospital of approximately $50,000.00. Dr Cotton immediately notified Mr. Carmichael of his findings. From the time of discovery in late 1997 through most of 1998, Dr. Cotton worked with Mr. Carmichael and outside legal counsel to rectify this matter. During this time period, Dr. Cotton and Mr. Carmichael sent approximately three letters to Mr. Steve Handy, Vice President of Uniontown Hospital. Each of these letters was either written by or reviewed and approved by Mr. Carmichael.

Defendant's argument that Dr. Cotton was terminated because of allegedly "freezing out" Ms. Patricia Casey is contradicted by Mr. Carmichael and Ms. Beverly Ludlums' memos

indicating Ms. Casey was terminated for performance issues unrelated to Dr. Cotton. The memo of May 6, 1999 from Mr. Carmichael indicated that Ms. Casey was relieved of her position for reasons unrelated to Dr. Cotton. The memo of May 18, 1999 from Beverly Ludlum lists Ms. Casey's performance issues as reasons for termination that are all unrelated to Dr. Cotton. Ms. Ludlum states that Dr. Cotton and Ms. Casey "had developed a professional relationship" and "publicly supported each other."

Defendant's argument is further contradicted by Anna Paglia's testimony that Ms. Casey had an emotional attachment to Dr. Cotton and by the fact that Dr. Cotton received a superior performance evaluation that day after Ms. Casey was relieved of her duties.

Defendant's argument that Dr. Cotton was terminated for improperly inviting Ms. Donna Lengle into the May 12, 1999 meeting is contradicted by the fact that both men actually invited Ms. Lengle into the meeting and that Dr. Cotton did not demand that Ms. Lengle be promoted. It is absurd to conclude, as Defendant urges this Court to do, that an executive who is both a physician and an attorney, has been repeatedly promoted, rewarded and rated as superior in his performance could be terminated for allegedly inviting the wrong person into the May 12, 1999 meeting.

## IV. DAMAGES

Dr. Cotton is entitled to be fairly and adequately compensated for all the financial injury he has sustained as a result of the incident. Dr. Cotton is entitled to be compensated completely for damages sustained in the past, as well as damages he will sustain in the future. Dr. Cotton's items of damages recoverable in this case are: 1) loss of past earnings; 2) loss of past bonuses; 3) loss of 3% stock option; and 4) punitive damages.

A determination that Dr. Cotton has sustained actual damage as a result of the Defendant's wrongful conduct would warrant an award of punitive damages for the purpose of punishing and making an example of the Defendant. An award of punitive damages is

6

appropriate in this case if it is determined that Defendant acted with malice (or other wrongful mental state) in terminating Dr. Cotton. <u>Kennard v. Louis Zimmer Communications, Inc.</u>, 632 F. Supp. 635 (E.D. Pa. 1986). Punitive damages are commonly awarded in a case involving an intentional tort of wrongful discharge. <u>Woodson v. AMF Leisureland Centers, Inc.</u>, 842 F.2d 699 (3d Cir. 1988).

In presenting a case for punitive damages, the jury can hear evidence of the wealth of the wrongdoer. <u>Tunis Bros. Co. v. Ford Motor Co.</u>, 952 F.2d 715 (3d Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992). The wealth of the wrongdoer is its net worth (value of assets less liabilities). <u>Sprague v. Walter</u>, 441 Pa. Super. 1, 656 A.2d 890 (1995), *allocatur denied*, 543 Pa. 695, 670 A.2d 142 (1996). The financial circumstances of the company is important in determining what will be a sufficiently heavy penalty to act as punishment. <u>Caruso v. Coleman</u>, 157 F.R.D. 344 (E.D. Pa. 1994).

Respectfully submitted,

HAGGERTY LAW FIRM

By: _____
William E. Haggerty, Esquire
Co-counsel for Plaintiff
Attorney I.D. No. 23845
240 North Duke Street
Lancaster, PA 17602
(717) 397-3200

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving a true and correct copy of the foregoing document upon the person(s) and in the manner indicated below, which service satisfies the requirements of the Federal Rules of Civil Procedure.

### SERVICE BY HAND DELIVERY ADDRESSED AS FOLLOWS:

David R. Fine, Esquire
Kirkpatrick & Lockhart
240 North Third Street
Harrisburg, PA  17101-1507

DATED:  February 21, 2002

HAGGERTY LAW FIRM

By: _____
William E. Haggerty, Esquire
Attorney I.D. No. 23845
Attorney for Plaintiff
P.O. Box 1527
Lancaster, PA  17608-1527
(717) 397-3200